**Ralph NADER and The Aviation Consumer Action Project, Petitioners,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Air Transport Association of America, Intervenor.**

**No. 80–1673.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 30, 1981.

Decided June 15, 1981.

454

Cornish F. Hitchcock, Washington, D. C., with whom John Cary Sims, Washington, D. C., was on the brief, for petitioners.

Alan R. Demby, Atty., C. A. B., Washington, D. C., with whom Michael Schopf, Deputy Gen. Counsel, and Glen M. Bendixsen, Associate Gen. Counsel, C. A. B., Washington, D. C., were on the brief, for respondent. J. Thomas Ezell, III, Atty., C. A. B., and Robert B. Nicholson and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent.

William C. Burt, Washington, D. C., with whom David L. Vaughan, James E. Landry, and George S. Lapham, Jr., Washington, D.C., were on the brief, for intervenor.

Before BAZELON, Senior Circuit Judge, and WRIGHT and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

The petitioners, Ralph Nader and the Aviation Consumer Action Project (hereinafter collectively Nader), challenge certain guidelines promulgated by the Civil Aeronautics Board (CAB) governing the exercise of the Board's discretion to suspend newly filed airline fares pending investigation. Nader contends that the guidelines are violative of the Airline Deregulation Act of 1978.[1] Finding no merit in Nader's argument, we affirm.

I

In the challenged guidelines, which were the result of rulemaking proceedings conducted in 1980, the Board announced that newly filed domestic air fares lying within a certain zone surrounding the standard industry fare level (SIFL)[2] would only face a limited risk of suspension.[3] The guidelines

---

1. Pub.L. 95–504, 92 Stat. 1705 (1978) (codified in scattered sections of 45 and 49 U.S.C. (Supp. III 1979)).

2. This is "the predominant fare in effect on July 1, 1977, as updated periodically for cost increases * * *." Policy Statement (PS) 94, Domestic Passenger Fare Flexibility, 45 Fed. Reg. 40969, 40969 n.2 (1980).

3. The Board had previously employed a zone of limited suspension. See PS–80, Domestic Passenger-Fare Level Policies, Domestic Passenger-Fare Structure Policies and Discount Fare Policy, 43 Fed.Reg. 39523, 39535 (1978). In the

provide that in the upper region of the "zone of limited suspension," a region comprised of fares exceeding SIFL but by no more than 30 percent plus $15,[4] the Board will not suspend a fare "except upon a clear showing of abuse of market power that the Board does not expect to be corrected through marketplace forces[.]"[5] And fares below SIFL, constituting the lower region of the zone, will not be suspended "except in extraordinary circumstances."[6]

Nader challenges only the upper region of the zone of limited suspension. He argues that CAB violated the Airline Deregulation Act of 1978 by relaxing its suspension power over fares lying within that region.

## II

Before we reach Nader's claim, however, we must address CAB's argument that the guidelines are not judicially reviewable. The Board's argument is twofold. First, CAB contends that the guidelines represent nothing more than policy statements, which "as a general matter * * * are not subject to judicial review."[7] Second, the Board argues that, because the subject matter of the guidelines is the Board's exercise of its discretion to suspend air fares, the guidelines are nonreviewable under the decisions of the Supreme Court holding that suspension orders are ordinarily nonreviewable. *See Arrow Transportation Co. v. Southern R. Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 50 (1963); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). For the reasons that follow, we find CAB's two arguments con-

cerning reviewability of the guidelines to be unpersuasive.

### A.

Contrary to what CAB suggests, the suspension guidelines do not constitute mere policy statements; rather, they represent substantive rules. That they were labeled by the Board as "statements of general policy" does not alter our view. As this court has noted, "If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is—a binding rule of substantive law." *Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Ins. Corp.,* 589 F.2d 658, 666–667 (D.C.Cir.1978) (footnote omitted). Here the guidelines do just that: they narrowly limit the Board's discretion to suspend air fares lying within the guidelines' zone of limited suspension. The portion of the guidelines challenged by Nader provides:

(d) *Upward Flexibility.* Each carrier may set fares above the SIFL as follows, and where they are so set, *the Board will not suspend them* on the grounds that their level is unreasonable except upon a clear showing of abuse of market power that the Board does not expect to be corrected through marketplace forces:

(1) For service on the Mainland: Up to 30 percent above the sum of SIFL plus $15. * * *

(2) For service between the Mainland and Puerto Rico, the Virgin Islands, Hawaii, or Alaska: Up to 30 percent above the SIFL.

---

two orders here under review the Board expanded that zone—according to Nader, in an impermissible way. In its first order, PS–94, *supra* note 2 (*amending* 14 C.F.R. §§ 399.32, 399.33, 399.35), the Board revised both the upper and lower portions of the zone. The amendments to the upper portion were, however, superseded by slightly different amendments contained in the Board's second order, issued by the Board upon reconsideration of its first order. PS–98, Statements of General Policy: Domestic Passenger Fare Flexibility, 45 Fed.Reg. 70431, 70433 (1980) (*amending* 14 C.F.R. § 399.92).

4. This upper ceiling applies to air service on the Mainland. With respect to air service between the Mainland and Puerto Rico, the Virgin Islands, Hawaii, or Alaska, the upper ceiling is SIFL plus 30%. *See* text at pp. 455–456 *infra* (*quoting* guidelines).

5. PS–98, *supra* note 3, at 70433.

6. PS–94, *supra* note 2, at 40973.

7. Brief for respondent at 24.

PS–98, Statements of General Policy: Domestic Passenger Fare Flexibility, 45 Fed. Reg. 70431, 70433 (1980) (second emphasis added). This mandatory language, which narrowly circumscribes the Board's discretion to suspend air fares falling within the upper region of the zone of limited suspension plainly constitutes a substantive rule. *See American Bus Ass'n v. United States,* 627 F.2d 525, 532 (D.C.Cir.1980). Inasmuch as this rule has already been put into effect, we hold that it is ripe for review.[8] *See Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 418–419, 62 S.Ct. 1194, 1200–1201, 86 L.Ed. 1563 (1942); *Public Service Comm'n for State of New York v. FPC,* 463 F.2d 883, 885 (D.C.Cir. 1972) (holding ripe for review an order of the Federal Power Commission announcing a change in duration of tariff suspensions). *See also Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 122 (D.C.Cir.1975) (*en banc*).[9]

### B.

CAB's claim that the suspension guidelines are nonreviewable under the Supreme Court's decisions in *Arrow Transportation, SCRAP,* and *Aberdeen & Rockfish* is also off the mark. These cases stand for the proposition that, where Congress has committed to the discretion of an agency the power to suspend newly filed rates, a

decision by that agency to suspend or not to suspend a particular rate filing is ordinarily not judicially reviewable. That proposition has not been read, however, to preclude "jurisdiction to review suspension orders to the limited extent necessary to ensure that such orders do not overstep the bounds of Commission authority." *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 638 n.17, 98 S.Ct. 2053, 2058, 56 L.Ed.2d 591 (1978). *See also Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 243 n.20 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980). It is therefore not surprising, but it is logical, that this court has previously declined to apply the nonreviewability-of-suspension-orders doctrine to bar review of a suspension policy where it was claimed that the policy violated the "plain statutory directive." *Public Service Comm'n for State of New York v. FPC, supra,* 463 F.2d at 885. That is, of course, the situation in the instant case. The essence of Nader's challenge is that the suspension guidelines CAB adopted violate the terms of the Airline Deregulation Act of 1978. Where, as here, the claim is that it was beyond the province of an agency to adopt as a rule a certain suspension policy, the nonreviewability-of-suspension-orders doctrine is simply inapplicable.[10]

8. The test for ripeness, articulated in *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 126, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), has, of course, two components: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." As we understand CAB's argument, its contention that the guidelines are mere policy statements is intended to demonstrate that the "fitness" component is not satisfied. We do not understand CAB or the intervenor as making any claim that the "hardship" component of the ripeness test is not satisfied.

9. In our view, the two pronouncements in which the suspension guidelines were announced, PS–94, *supra* note 2, and PS–98, *supra* note 3, constitute "orders" inasmuch as the administrative record permits judicial review and the pronouncements represent the final disposition of the rulemaking proceedings initiated in April 1980 to develop new suspension guidelines. *See Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416–417, 62 S.Ct. 1194, 1199–1200, 86 L.Ed. 1563 (1942); *City of Rochester v. Bond,* 603 F.2d

927, 932, 933 & n.26 (D.C.Cir.1979); 5 U.S.C. § 551(6) (1976) (defining "order" for purpose of the Administrative Procedure Act as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form"). Subject matter jurisdiction is therefore conferred on this court by § 1006(a) of the Federal Aviation Act, 49 U.S.C. § 1486(a) (1976) ("Any order * * * issued by the Board * * * shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia * * *.").

10. The doctrine may also be inapplicable on the ground that the orders under review were not interlocutory in nature, but rather final orders concluding the rulemaking proceedings. While we decline to reach this broader question, we do note that there are strong suggestions in *Arrow Transportation, SCRAP,* and *Aberdeen & Rockfish* that the nonreviewability-of-suspension-orders doctrine is predicated on the interlocutory nature of the suspension orders, and that it should therefore not be extended

## III

Having disposed of CAB's claim that the guidelines are not judicially reviewable, we may now reach the merits: the issue of whether in adopting the guidelines CAB exceeded the authority granted to it under the Airline Deregulation Act of 1978. Nader argues that to the extent CAB included in its zone of limited suspension fares exceeding SIFL by more than five percent the Board violated the Act. For his argument Nader relies principally on Section 37(a)(2) of the Act, which denies the Board the authority, except in rare instances, to find any rate not exceeding SIFL by more than five percent or falling below SIFL by more than 50 percent "to be unjust or unreasonable on the basis that such rate is too low or too high * * *." 49 U.S.C. § 1482(d)(4)

(Supp. III 1979).[11] Citing some vague legislative history suggesting that Congress did not intend CAB to abandon its regulatory supervision of fares outside the statutory zone, Nader asserts that the Board may not lessen the risk of suspension with respect to those fares not falling within the statutory zone. Therefore, Nader concludes, the Board violated the Act by including in the upper region of the zone limited suspension fares exceeding SIFL by more than five percent.[12]

The problem with Nader's argument is that there is simply no support for it in either the language of the Act or the legislative history. Section 37(a)(2) of the Act establishes a zone of fares in which CAB cannot, except in unusual instances,[13] find a fare to be unjust or unreasonable on the

beyond that context. *See, e. g., Arrow Transportation Co. v. Southern R. Co.*, 372 U.S. 658, 671, 672 n.24, 83 S.Ct. 984, 991, 10 L.Ed.2d 50 (1963); *United States v. SCRAP*, 412 U.S. 669, 691, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1973); *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 316, 95 S.Ct. 2336, 2354, 45 L.Ed.2d 191 (1975). *See also Southern R. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 460, 99 S.Ct. 2388, 2397, 60 L.Ed.2d 1017 (1979).

11. Section 1482(d)(4) provides in relevant part:
    (4) The Board shall not have authority to find any fare for interstate or overseas air transportation of persons to be unjust or unreasonable on the basis that such fare is too low or too high if—
    (A) with respect to any proposed increase filed with the Board on or after July 1, 1979 (other than any proposed increase in any fare filed by any air carrier if such proposed fare is for air transportation between any pair of points and such air carrier provides air transportation to 70 per centum or more of the persons traveling in air transportation between such points on aircraft operated by air carriers with certificates issued under section 1371 of this title), such proposed fare would not be more than 5 per centum higher than the standard industry fare level for the same or essentially similar class of service, except that, while no increase of any fare within the limits specified in this subparagraph may be suspended, an increase in such fare, above the standard industry fare level shall be found unlawful if that increase results in a fare which is unduly preferential, unduly prejudicial, or unjustly discriminatory; or
    (B) with respect to any proposed decrease filed after October 24, 1978, the

proposed fare would not be more than 50 per centum lower than the standard industry fare level for the same or essentially similar class of service, except that this provision shall not apply to any proposed decrease in any fare if the Board determines that such proposed fare would be predatory.

12. Nader does not challenge the lower region of the Board's zone, although it includes fares that are lower than SIFL by more than 50%. According to Nader, § 37(a)(7) of the Deregulation Act, 49 U.S.C. § 1482(d)(7) (Supp. III 1979), explicitly gives the Board authority to apply its policy of limited risk of suspension to those fares lying below the statutory zone. In our view, § 37(a)(7) is entirely irrelevant insofar as the Board relaxed its suspension power rather than its authority to find fares unjust or unreasonable. *See* note 15 *infra*. Nevertheless, for the same reasons that follow in text, we think it is clear that the Board has the authority to apply a policy of limited risk of suspension to fares lying below the statutory zone.

13. With respect to a proposed fare greater than SIFL but not by more than 5%, the Board retains authority to find it unlawful if it "is unduly preferential, unduly prejudicial, or unjustly discriminatory * * *." *See* 49 U.S.C. § 1482(d)(4)(A) (Supp. III 1979), *quoted in* note 11 *supra*. Similarly, in the lower region of the statutory zone—that region comprised of fares lower than SIFL but not by more than 50%—the Board retains authority to find a fare unlawful if the "proposed fare would be predatory." 49 U.S.C. § 1482(d)(4)(B) (Supp. III 1979), *quoted in* note 11 *supra*.

ground that the fare is too high or too low. While the Board's authority to suspend fares within this statutory zone was necessarily altered, inasmuch as the Board was deprived of authority to find the fares unjust or unreasonable,[14] there is nothing in the section [15] to suggest that the Board's discretion to suspend or not to suspend air fares outside this zone was in any way altered.[16] It therefore follows that the Board, retaining *discretion not to suspend* fares falling outside the statutory zone, could announce a policy of limited risk of suspension for those fares lying beyond the statutory zone.

The legislative history Nader relies on demonstrates no more than that Congress intended the Board to retain its jurisdiction to find unjust or unreasonable those fares lying outside the statutory zone. But CAB has never disputed this point. To the contrary, CAB, in establishing its zone of limited suspension, made explicit that it was not abandoning, but rather was retaining, its authority to find unjust or unreasonable all fares falling outside the statutory zone:

> *We are retaining jurisdiction over the reasonableness of all fares that are outside the statutory zone, including those within the new limits. We can investigate any such fare and find it unlawful. The new policy merely states that we will ordinarily not suspend it while an investigation is in progress. Moreover, we will suspend a fare within the new limits when necessary, that is, when we find an abuse of market power that we do not expect to be corrected through marketplace forces. * * ***

PS–94, Domestic Passenger Fare Flexibility, 45 Fed.Reg. 40971 (1980) (emphasis added).

## IV

For the foregoing reasons, the orders under review are

*Affirmed.*

---

**14.** Indeed, § 37(a)(2)(A) of the Deregulation Act, 49 U.S.C. § 1482(d)(4)(A) (Supp. III 1979), explicitly provides that "no increase of any fare within the limits specified in this subparagraph [greater than SIFL but not by more than 50%] may be suspended * * *." *See* note 11 *supra.* Presumably the Board's authority to suspend fares within the lower region of the statutory zone was also eliminated, although the Act does not explicitly say so. It thus seems that for those fares lying within the Board's zone of limited suspension, but *also within the statutory zone,* there is *no risk* of suspension.

**15.** Nader does also point to § 37(a)(7) of the Deregulation Act to support his argument. That section provides that the Board "may by rule" lower the floor of the statutory zone. 49 U.S.C. § 1482(d)(7) (Supp. III 1979). Nader argues that the absence of any similar language in the Deregulation Act granting the Board authority to expand the upper region of the statutory zone means that Congress did not want CAB to relax the risk of suspension above the statutory zone. But the fact that the Board may enlarge the lower region of the statutory zone, in which the Board is denied authority, except in rare instances, *see* note 13 *supra, to find a fare unlawful,* simply does not mean that the Board's discretion *not to suspend* fares above the statutory zone was in any way altered. Thus, as the Board noted, "[the] observation that Congress has expressly given us the authority to disclaim jurisdiction over the reasonableness of fares below the floor of the statutory zone by increasing the downward zone but failed to give us similar authority to increase the upward zone is correct. But it is not relevant." PS–94, *supra* note 2, at 40970–40971 (*quoting* PS–92, Statements of General Policy: Domestic Passenger Fares, 45 Fed.Reg. 24115 (1980)) (brackets in original).

**16.** The Federal Aviation Act provides that CAB has discretion, pending any investigation by it into the lawfulness of a fare, to suspend that fare for a period up to 180 days. 49 U.S.C. § 1482(g) (Supp. III 1979).