**AMERICAN TRUCKING ASSOCIATION, INC., et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 83–2993.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 16, 1984.

Decided Feb. 27, 1985.

James E. Doyle, Senior District Judge, sitting by designation, filed a concurring opinion.

Patrick McEligot, Rea, Cross & Auchincloss, Washington, D.C., for petitioners.

Craig M. Keats, I.C.C., Washington, D.C., for respondents.

Before BAUER and CUDAHY, Circuit Judges and DOYLE, Senior District Judge.*

CUDAHY, Circuit Judge.

This case is before us on a petition to review a Report of the Interstate Commerce Commission (the "Commission" or the "I.C.C."), entered in *Ex Parte No. MC–166.* The Report in question provided, *inter alia,* an analysis of the economic and regulatory impacts of the more competitive pricing practices occurring in the motor carrier industry in a partially deregulated environment. The Report also assessed the lawfulness of these motor carrier pricing practices. Insofar as the Report related particularly to the concerns of the petitioners here, it referred to, or reiterated, a Commission policy not to use its power to suspend rate reductions undertaken for competitive purposes before they went into effect. We dismiss the petition for review because the report does not constitute a "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704, nor is it a "final order" under the Hobbs Act, 28 U.S.C. §§ 2321(a) and 2342(5). Even if the Report met these criteria of reviewability it is not ripe for review.

. I.

The case before us arose in the course of the partial deregulation—frequently traumatic to truckers and their employees—of the motor carrier industry. Federal regulation of motor carriers was first implemented under the Motor Carrier Act of 1935, which subjected motor common carriers of property to licensing and rate regulation by the Interstate Commerce Commission. Originally, the Commission tightly controlled entry into the trucking industry "on the premise that the public interest in

---

* The Honorable James E. Doyle, Senior District Judge of the Western District of Wisconsin, sitting by designation.

maintaining a stable transportation industry so required." *U.S. v. Drum*, 368 U.S. 370, 373–74, 82 S.Ct. 408, 410, 7 L.Ed.2d 360 (1962). Consistent with this limitation on entry, the I.C.C. also strictly regulated motor carrier rates, which were set primarily through collective pricing decisions made by "rate bureaus." These were agencies (some of which are petitioners here) established by carriers to facilitate the negotiation of collective rates. Obviously, these arrangements tended to discourage rate competition.

In the course of the 1970s, as a groundswell for deregulation of certain regulated industries developed, the I.C.C. reassessed the public interest in entry and rate regulation and began relaxing its entry standards.[1] The Commission began to accord more weight to the purported benefits of competition in determining whether a new carrier should be licensed. In several actions the Commission began to encourage rate competition and innovation in the motor carrier industry. *See Consideration of Rates in Operating Rights Applic. Proc.*, 359 I.C.C. 613, 616 (1979); *Multiple Tender Allowance, Transamerican*, 352 I.C.C. 825, 841 (1976).

In an atmosphere in which there continued to be strong pressures toward deregulation as well as significant forces resisting it, Congress enacted the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (the "1980 Act"). Congress specifically intended to relax entry regulation and encourage rate flexibility and competitive pricing in the motor carrier industry. *See* H.R. REP. No. 1069, 96th Cong., 2d Sess. 12 (1980) (the "Conference Report"), U.S.Code Cong. & Admin.News 1980, p. 2283, 2294.[2] In enacting this new motor carrier policy (codified at 49 U.S.C. § 10101(a)(2)), Congress through the Conference Report noted that "[i]t is clearly the Committee's intent that the Commission must recognize the importance of competition and efficiency in

motor carrier operations as the most desirable means for achieving national transportation goals and objectives." Conference Report at 12. Thus, in the licensing area, the 1980 Act codified relaxed entry standards, while in the rate area the legislation implemented the Congressional purpose that the Commission continue to remove the regulatory barriers to individual motor carrier pricing initiatives.

With regard to rates, the 1980 Act did not alter the longstanding requirement of 49 U.S.C. § 10701(a) that carrier rates be reasonable. The new law did, however, effect fundamental changes to reflect Congress' expressed intent that "motor carriers [be given] greater freedom to set rates in response to market demands." Conference Report at 4. The 1980 Act substantially moved away from collective ratemaking in the direction of competitive pricing by individual carriers, and also reduced the Commission's authority to deal with pricing moves by individual motor carriers. This Commission authority has traditionally been exercised through the I.C.C.'s adjudication of formal complaints alleging that motor carrier rates are not reasonable and through the Commission's discretionary suspension and investigation of proposed rates before they become effective. One of the most significant changes that the 1980 Act made in the Commission's regulatory authority was the creation of a "zone of rate freedom" (ZORF). (1980 Act, § 11, codified at 49 U.S.C. § 10708(d)). This change did not alter the Commission's duty to adjudicate formal complaints concerning rate reasonableness, but Congress sharply curtailed the Commission's discretion to suspend individually set rates that fell within the liberally defined zone of rate freedom. Petitioners point out that the non-suspension policy in question here goes well beyond that mandated by the ZORF provision.

1. For a relatively early discussion of the merits of trucking regulation, see 2 A. KAHN, THE ECONOMICS OF REGULATION, 178–193 (1971).

2. This report was approved by the Senate in lieu of a Conference Report, *see* remarks of Congressman Harsha, 126 Cong.Rec. H5345 (daily ed. June 19, 1980), and will be referred to here as the "Conference Report."

Since the increased competition following on the passage of the 1980 Act coincided with an economic recession, there was an increase in carrier capacity occurring at the same time as a decline in traffic. This led to price cutting, business failures and financial turbulence in the trucking industry. In response to these negative developments several motor carriers filed a petition with the I.C.C. in November, 1981, seeking institution of a proceeding to develop standards to govern freight rate discounts. In particular, the motor carriers asked the Commission to promulgate ·formal standards for determining whether particular rate reductions constitute predatory or destructive competitive practices or whether they should be suspended before becoming effective. In May, 1982, the Commission denied the motor carriers' petition. *Lawfulness of Volume Discount Rates—Motor Common Carriers*, 365 I.C.C. 711 (1982) (*"Discount Rates I"*). The Commission stated that establishment of the requested standards against predation would tend "to stifle legitimate competition and retard efficiency" and was therefore undesirable. 365 I.C.C. at 712. The Commission also expressed its view that the suspension process, in which proposed rates can be enjoined before they become effective, is generally "a premature process for addressing predation ... based on naked allegations ..." 365 I.C.C. at 715. Beyond this, the Commission stated its belief that formal complaints were the better means of addressing allegations of predation or "destructive competition."

Shortly after the issuance of the decision in *Discount Rates I*, the American Trucking Associations filed another petition for essentially the same relief that had been denied other parties in *Discount Rates I*. The Commission summarily dismissed this petition noting that, while it was willing to consider requests for suspension on a case

by case basis, it was not willing to set generalized prospective standards applicable to *all* discount rates. *Petition For Declaratory Order—ATA—Lawfulness of Discount Rates*, No. 38872, not printed, served October 1, 1982 (*Discount Rates II*). The Commission's denial of this petition was on the ground that "ATA's contentions are all adequately discussed in a recent Commission decision denying a similar declaratory order sought by a group of 15 motor common carriers."[3] Judicial review was not sought either of *Discount Rates I* or *Discount Rates II*.

In a concurring opinion in *Discount Rates II*, Vice Chairman Gilliam indicated that, in lieu of proceeding on a case by case basis or by rulemaking, the Commission had agreed to develop a policy statement with full benefit of public comment. Instead of producing the formal policy statement Vice Chairman Gilliam had originally ·envisioned, however, in October, 1982, the Commission undertook a much less definitive task. The I.C.C. merely concluded that a public airing of the issues would improve the agency's and the public's understanding of recent industry pricing trends. Accordingly, in a notice issued on October 29, 1982 (47 Fed.Reg. 49481, November 1, 1982), the Commission sought comments on ten questions directed toward three basic issues: (1) a description and explanation of new pricing practices; (2) an assessment of the effects of those practices; and (3) a request for recommendations on whether further Commission action would be appropriate. Several parties filed comments, and the Commission in response issued the *MC–166* Report, Pricing Practices of Motor Common Carriers of Property Since the Motor Carrier Act of 1980, *Ex Parte MC–166* (served Sept. 13, 1983), that is the subject of the petition for review now before us.

---

**3.** *Discount Rates II* also suggests that the policy against suspension of rate reductions is not iron-clad. The I.C.C. there said of its earlier decision (*Discount Rates I*):

The Commission at page 716 clearly stated that the protest remedy is available against

individual proposed rates. *Consequently, where warranted, the Commission will use its discretionary investigative or suspension powers.*

*Discount Rates II* at 1 (emphasis supplied).

The Commission concluded that the more competitive pricing practices implemented since the 1980 Act had resulted in greater efficiency for carriers and shippers and, ultimately, lower prices for the consumer. In this context the failure of certain carriers was not necessarily contrary to the public interest. With respect to the lawfulness of the prevalent pricing practices, the Commission reiterated the observations that it had made in *Discount Rates I*—that predation or destructive competition is unlikely in the motor carrier industry because of ease of entry, low capital costs and availability to shippers of alternative markets. It also repeated its earlier conclusions that the existing standards for discrimination were adequate and that the suspension process is not generally a satisfactory vehicle for determining predatory behavior. The reason for not pursuing suspension is that the evidence needed to assess unlawful pricing claims is more readily available after the rate becomes effective, when there is an opportunity to observe the behavior of the rate proponent. Moreover, the I.C.C. stressed that a case-by-case approach is preferable to the promulgation of general standards for the prospective review of pricing practices, which would tend to inhibit its ability to deal flexibly with future industry conditions. In the petition presently before us the ATA has sought review of the Commission's Report, and in particular its conclusion or observation that rate reductions generally should not be suspended on the allegation that they are predatory or result in destructive competition.

## II.

■ The petitioners have sought to invoke this court's jurisdiction under 28 U.S.C. §§ 2321(a) and 2342(5), which confer upon the courts of appeals exclusive jurisdiction to review the validity of "all rules, regulations or final orders" of the Commission. In addition, the Administrative Procedure Act subjects to judicial review "final agency action" for which there is no other adequate judicial remedy. 5 U.S.C. § 704. The threshold question, therefore, is whether the Report at issue constitutes judicially reviewable "agency action" at all. The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). This definition is similar to the provisions of the Hobbs Act, 28 U.S.C. §§ 2321(a) and 2342(5), regarding final orders. Because of this similarity the term "action" in this opinion should be taken to mean both "action" for APA purposes and "order" for Hobbs Act purposes.

We do not believe that the Commission's *MC-166* Report is an agency "action." To the extent that the issue is focused on whether the Commission has adopted any general rule on suspensions of rate reductions, we believe that it may have done so in *Discount Rates I* or *Discount Rates II* where it denied petitions for formal proceedings. These denials may have constituted final and reviewable agency actions. The present proceeding, on the other hand, really purports to be an educational undertaking toward the end that "a greater understanding may be gained of the pricing techniques now being developed by the trucking industry." *Ex Parte MC-166* at 1. With partly therapeutic aims, the Commission said it would receive comments from the participants and issued its "response [designed to] promote certainty, clear the air, and encourage rate innovation." *Id.* We do not believe that that response fixed, or was intended to fix, any legal rights. Thus, the Commission's own characterization of its undertaking, although it is certainly not dispositive, does strongly suggest that its Report is not an order subject to review. *See Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 39 (D.C.Cir.1974).

In the Report which we are asked to review here, the Commission made several references to the central issue of suspension of rates alleged to be predatory. Thus, the Commission said:

In our *Discount Rates* proceeding, we addressed our responsibility insofar as predation is concerned. We recognized

our authority to determine whether a particular practice is predatory, but stated that "the suspension and investigation format is a premature process for addressing predation and that further general standards aimed at that process would not be useful."

... The suspension or investigation of rates, based only upon naked allegations of predation or upon an overly broad rule aimed at predation, would discourage legitimate pricing techniques and frustrate Congress' overall policy and specific requirements.

*Ex Parte MC–166* at 10 (footnote omitted). The I.C.C. went on to say:

As discussed in *Discount Rates,* we would also reiterate our belief that predation and other unlawful pricing claims discussed here cannot be properly addressed at the suspension level.

*Ex Parte MC–166* at 16.

These statements of the Commission do not purport to announce rules of law nor do they impose an obligation, determine a right or liability or fix a legal relationship. They merely state or restate in a general and expository way certain conclusions drawn by the Commission on rate suspension and suggest reasons for those conclusions. We do not believe they are reviewable "actions" of this agency.

█ The respondents also argue that the *MC–166* Report is not ripe for review. Ripeness for review is, of course, to be determined by reference to two criteria: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Koehring v. Adams,* 605 F.2d 280, 282 (7th Cir.1979).

█ The respondents argue that the case before us is not fit for judicial review because the relief petitioners seek cannot be granted by any court. Petitioners presumably want this court to direct the Commission to suspend or investigate rate reductions that are or appear to be unlawful.

But it is well established that with respect to particular challenged rates, a court may not direct the Commission to suspend or investigate. *Southern Railway v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979); *Aberdeen & Rockfish Railroad v. SCRAP,* 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); *United States v. SCRAP,* 412 U.S. 669 (1973); *see also Arrow Transportation Co. v. Southern Railroad,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

Respondents argue that, if a court cannot order the Commission to suspend rates in individual cases, it would make no sense to review an informal policy statement regarding the Commission's views on suspension because, regardless what the Commission says in its informal reports, the agency will still retain unreviewable discretion to suspend or not to suspend rates in individual cases. While we do not necessarily adopt this rationale, we think that it has some practical merit. Thus, in *Nader v. Civil Aeronautics Board,* 657 F.2d 453 (D.C.Cir.1981), the District of Columbia Circuit found reviewable and then affirmed a formal amendment by the Civil Aeronautics Board of its suspension procedures to preclude suspension of certain types of air carrier rates. We think that *Nader* does not control the present case because the language (quoted above) used by the Commission here in discussing its suspension policy is expository or analytical rather than mandatory and contrasts sharply with the language reviewed in *Nader* ("... the Board will not suspend them ...", 657 F.2d at 455). But, in any event, in *Nader,* although the nature of the language used is a sufficient basis of distinction from the present case, the D.C. Circuit, while it did grant review, went on to affirm the CAB's order. The court did so primarily on the basis that, since the statute in question gave the agency discretion not to suspend certain rates, the agency's policy against suspending them could hardly overstep its authority. Thus, the fact of unfettered agency discretion in individual cases, which in *Nader* was found sufficient (without much discussion) to validate the agency's

formal policy statement, is here cited as a reason to deny review. As noted, while we do not rest our decision on this ground, we think it may make as much sense to deny review for this reason as it does to grant review and summarily approve the policy.[4]

In addition, in the present case the petitioners have requested that the Commission entertain petitions for suspension. But, as we have noted, the Commission has not stated that it will *never* suspend rate reductions, *see supra* note 3. Rather, we think that the Commission has indicated why it believes that as a general proposition suspension is not the most appropriate response to an allegation that rate reductions are predatory or otherwise destructively competitive. Here, we believe that in this respect the Commission's Report is not fit for review.

Nor does the second ripeness criterion—hardship from review withheld—appear to raise a critical obstacle here. For denial of review of this informal Report will not apparently impose a substantial hardship on petitioners or their members. The Report does not command the motor carriers, or any other person, to do or refrain from doing anything. It does not determine the lawfulness of any particular rate, nor does it preclude petitioners from seeking suspension, or challenging the rates of other carriers in any appropriate manner.

In contrast to the civil and criminal penalties to which non-complying parties could have been directly subjected in *Abbott Laboratories, supra*, petitioners here allege only that some of their members may lose some revenues if the Commission does not act as petitioners demand. If need be, petitioners' members can seek to protect themselves by filing a complaint and then obtaining judicial review if they are aggrieved by the agency's decision. Although petitioners argue that this process is lengthy and they may not be able to recoup losses that might be suffered in the interim, speculative revenue loss is not the kind of direct hardship contemplated by *Abbott Laboratories*. *See Toilet Goods Association v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1966); *Tennessee Gas Pipeline Co. v. Federal Energy Regulatory Commission*, 736 F.2d 747 (D.C.Cir.1984).

We believe that the petitioners' case would be more persuasive if the Report in question were of a more formal and mandatory nature. *See Nader, supra*. Judicial review, if it is appropriate at all—as it was held to be in *Nader*—would be more fitting with respect to formal guidelines amounting to substantive rules adopted to govern the suspension process. *See Nader*, 657 F.2d at 455.

■ Even if we were to grant review of an informal report such as this one, the scope of our review would be exceedingly narrow, and our approval of the Commission's action would therefore be virtually assured. The Report in question can be viewed most aptly as a denial of a petition for rulemaking or as a statement expressing the Commission's general policy. The Commission did not "promulgate" anything—certainly not anything new. The standard of review of policy statements or denials of rulemaking petitions is highly deferential. *See Arkansas Power and Light Company v. Interstate Commerce Commission*, 725 F.2d 716, 723 (D.C.Cir. 1984). Presumably, judicial deference is particularly appropriate when the agency's

4. We do not mean to suggest that the mere grant of wide discretion to an agency to make individual determinations should lead ineluctably to the conclusion that the agency's general rules with respect to such determinations are unreviewable. The court in *Nader* specifically rejected this argument. 657 F.2d at 456. We agree with the court in *Nader* that a suspension policy may be reviewed to ensure that it does not violate a plain statutory directive. *Id.* We note, however, that where the policy statement

is as non-directive as it is in this case, it is difficult to conceive how the policy could contravene the authority granted in the statute, and so as a practical matter denying review may be appropriate for precisely the same reasons that dictate approving the policy. Further, because of the informal nature of the policy statement, this branch of the ripeness analysis is ultimately somewhat duplicative of the discussion of non-reviewability where no agency "action" is involved, *supra*.

policies or observations concern the exercise in future individual cases of unfettered agency discretion. In this sense the same considerations that persuade us to deny review also would dictate that, if we were to grant review, we would approve the I.C.C.'s policy statement. *See Nader,* 657 F.2d at 458. Our mandate is only to determine whether the Commission's policy is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, and we must affirm a policy statement if it has a rational basis. *See Mercury Motor Express v. United States,* 648 F.2d 315, 319 (5th Cir.1981); *Assure Competitive Transportation v. United States,* 635 F.2d 1301, 1307 (7th Cir.1980). Because there is no statutory directive that the I.C.C. use the suspension process, rather than the complaint process, to determine whether motor carrier rates are below a minimum reasonable level, the Commission's observations in its Report are presumably not contrary to the statutory design. *See Nader,* 657 F.2d at 458.

While not necessary for our decision, we note that it does not appear that the Commission's approach to suspension of allegedly predatory rates is irrational. The question whether rates are predatory, or the theoretically less challenging question whether they are not compensatory, can be complex and demanding. *See MCI Communications v. AT & T,* 708 F.2d 1081, 1111 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The determination of an appropriate measure of cost and a proper method of allocating costs among services may be no simpler in a motor carrier context than in any other. In most cases, the Commission would have a very short time to consider rates which have been protested as unreasonable. It is not irrational, therefore, for the Commission to decide that suspension is not the best context in which to determine an issue of predation. Presumably a competitor

would not know the actual costs of a carrier proposing a discount rate and it would be burdensome for the proposer of the rate to prepare a full, individualized cost justification in advance each time it intended to propose a new discount rate. The need for full cost justification for discounts would arguably inhibit legitimate price competition. In addition, it is not irrational for the Commission to postulate that predation in the traditional sense is unlikely in the motor carrier industry where capital costs are relatively low and entry barriers are not formidable. It is not irrational to believe that a motor carrier would find it difficult to raise its prices high enough or long enough to recoup the losses sustained during the predation period.[5] *See MCI,* 708 F.2d at 1112, 1121–22, n. 57.

Thus, were we to undertake review, it would not appear that the Commission acted irrationally in indicating its reluctance to suspend rates on short notice as predatory. Nor was its conclusion irrational that *ex post* remedies (such as complaints and prosecution of the antitrust laws) would be more effective in preventing anti-competitive behavior than would be suspension. We understand the concern of these petitioners about operating in a relatively unregulated environment where entry is comparatively free and rates are permitted to drop to a competitive level. Without question this competitive mode of operation has imposed burdens on many truckers and their employees whatever its benefits to consumers. But this is an approach to operation and to regulation fostered by the Executive Branch and by the Interstate Commerce Commission and, of course, approved by Congress. Whatever may be the long-term merits of deregulation, it is not for us to intervene in measures for the rational implementation of the deregulation policy.

DISMISSED.

---

**5.** Presumably monopolists, or possessors of market power, may be able to facilitate predatory pricing by extracting monopoly profits from monopolized markets to offset losses resulting from charging below-cost prices in com-

petitive markets (thus taking advantage of their greater staying power). *See MCI,* 708 F.2d at 1123–24; 3 P. AREEDA AND D. TURNER, ANTITRUST LAW, 186–87; R. POSNER, ANTITRUST LAW, 28, 184–196.

DOYLE, Senior District Judge, concurring:

I concur in the dismissal of the petition on the ground that the Report is not "final agency action," within the meaning of the Administrative Procedure Act, or a "final order," within the meaning of the Hobbs Act. I have serious reservations about much that is said in the remainder of the opinion.