**INDUSTRIAL SAFETY EQUIPMENT ASSOCIATION, INC., et al.,**
**Appellants**

**v.**

**ENVIRONMENTAL PROTECTION AGENCY, et al.**

**No. 87–5096.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1987.

Decided Jan. 19, 1988.

---

Paul A. Koches, with whom William E. Wickens and Frank J. Pergolizzi, Washington, D.C., were on the brief, for appellants.

M. Alice Thurston, Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. General, Dept. of Justice, Alan Carpien, Office of General Counsel, E.P.A., Michael A. McCord and Martin W. Matzen, Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, SENTELLE, Circuit Judge, and GIBSON,* Senior Circuit Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

This controversy concerns the adequacy of various types of asbestos-protection respirators. The National Institute for Occupational Safety and Health (NIOSH) and the Environmental Protection Agency (EPA) published in April, 1986, a report recommending that "supplied-air" respirators be used for maximum protection against asbestos exposure.[1] Both agencies are authorized by statute to disseminate health information to the public. *See* Occupational Safety and Health Act, 29 U.S.C. §§ 669(a), (d), 671; Public Health Service Act, 42 U.S.C. §§ 241(a), 4321.[2] Occupational Safety and Health Administration (OSHA) and EPA regulations, however, permit industry members to use numerous devices not recommended in the Guide.[3] Plaintiffs-appellants Industrial Safety Equipment Association (ISEA), et al., brought a district court action on June 10, 1986 seeking declaratory and injunctive relief against publication of the Guide. They argued that the Guide violated the Administrative Procedure Act (APA) because it "constitutes or has the effect of new agency regulations," decertifying eleven lawful respirator types, yet it was not promulgated according to proper rulemaking processes. Secondly, they argued that the publication works an unconstitutional deprivation of their property interests in their respirator certifications.

On February 27, 1987, the district court dismissed with prejudice plaintiffs' complaint, ruling that because the Guide was a nonbinding, informational publication, it did not amount to reviewable agency action. 656 F.Supp. 852. This decision is before us on appeal. We hold with the district court that the NIOSH/EPA Guide's respirator recommendations do not constitute agency action that will sustain either an APA or due process claim.

## I. BACKGROUND

OSHA and EPA regulations protect employees against the serious health hazard posed by asbestos in the workplace. *See* 29 C.F.R. § 1910.1001; 40 C.F.R.

---

* Of the United States Court of Appeals for the Eighth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The report is entitled *A Guide to Respiratory Protection for the Asbestos Abatement Industry.* Joint Appendix (J.A.) at 137. Hereafter, the report will be referred to as the "Guide" and appellees will be referred to collectively as either the NIOSH or the EPA.

2. The EPA's specific role—financing the interagency publication—finds statutory basis in the

National Environmental Policy Act, 42 U.S.C. § 4362.

3. The NIOSH recently has proposed revisions to the Part 11 program, which specifies asbestos respirator-protection standards. 52 Fed.Reg. 32,402 (proposing changes in tests used to certify respirators). Similarly, on July 21, 1986, new OSHA regulations for asbestos protection took effect. *See infra* note 4.

§ 763.21(d). Both sets of regulations require that asbestos-protection respirators be selected from among those certified by the NIOSH and the Mine Safety and Health Administration (MSHA). *See* 30 C.F.R. Part 11. Specifically, there are thirteen federally approved respirators, ranging from "air purifying respirators" (filter devices) recommended for use when asbestos concentrations are relatively low, to "powered air purifying respirators," and finally to "supplied-air respirators" (self-contained breathing apparatuses), recommended as concentrations become progressively higher.[4]

In April, 1986, the EPA and the NIOSH published the Guide with the stated purpose of providing "a single source for the best and most current information on worker respiratory protection against asbestos." J.A. at 146. Both parties to this dispute agree that the Guide is also intended "to provide employers with guidelines for developing effective respiratory protection programs." J.A. at 64 (quoting Guide at 1); *see also* Brief of Appellees at 6. The Guide summarizes and builds on existing federal regulations that specify both the PELs and the authorized methods of complying with these limits. The largest section of the Guide describes a model program for asbestos abatement operations. The preface explains that the Guide's recommendations not only satisfy existing regulations but also incorporate the most current scientific information about how best to minimize worker exposure. Respirator use, of course, is a major method of compliance with the PELs. The Guide carefully distinguishes between the thirteen respirators all of which meet federal standards and the two types that the Guide recommends because they provide the maximum amount of worker protection. The most controversial passage in the Guide reads:

> The respirator types numbered 3 through 13 above are *not* recommended by NIOSH or EPA for use against asbestos. However, various existing regulations allow their use. In fact, the existing respi-

rator certification regulations (30 C.F.R. Part 11) requires NIOSH to certify … [these eleven]. However, as a matter of public health policy, NIOSH and EPA do not recommend their use in asbestos environments.

J.A. at 156 (excerpt is footnote in Guide, prefaced with exclamation "Important") (boldface and capitalization omitted).

Appellants claim that this disapproval of eleven lawful devices amounts to agency rulemaking, subject to review under the APA, because the action effectively "decertifies" the existing respirators marketed or used by appellants. The EPA counters that because the Guide formally binds no one, it cannot be viewed as rulemaking. Although we do not adopt the EPA's broad assertion that only legally binding publications can ever be reviewable, neither do we accept ISEA's characterization of the Guide as a *de facto* decertification of the respirators. We conclude that the EPA and NIOSH's publication of the Guide does not amount to agency action subject to judicial review.

## II. ANALYSIS

### A. *The Administrative Procedure Act*

■ The APA authorizes review of "*[a]gency action* made reviewable by statute and final *agency action*" for which there is no other adequate remedy in a court. 5 U.S.C. § 704 (emphasis added). The APA also specifies that standing for judicial review requires that a party be "adversely affected or aggrieved by *agency action*." *Id.* § 702 (emphasis added). In turn, the Act defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief, of the equivalent or denial thereof, or failure to act." …. *Id.* § 551(13). These categories are imprecise, and courts have made the threshold determination of reviewable agency action on a case-by-case basis.

Almost forty years ago, this court declared that publication by a government

---

4. Existing regulations key each respirator type to asbestos concentrations levels, or "permissi-

ble exposure limits" (PELs). Recent OSHA revisions to its regulations have reduced these PELs.

agency of material adverse to a party is not agency action under the APA, and hence is immune from judicial review.[5] *See Hearst Radio v. FCC*, 167 F.2d 225 (D.C.Cir.1948); *see also Kukatush Mining Corp. v. SEC*, 309 F.2d 647, 652 (D.C.Cir.1962) (Bazelon, C.J., dissenting). Courts and commentators, however, have been critical of any absolute rule against reviewability in cases of agency publicity.[6] Though in *Illinois Citizens Comm. for Broadcasting v. FCC*, 515 F.2d 397, 402 (D.C.Cir.1975), we reiterated *Hearst Radio*'s conclusion that if an agency statement is "not a decisional pronouncement affecting legal rights and obligations" it is unreviewable, more recently, in *Impro Products, Inc. v. Block*, 722 F.2d 845 (D.C.Cir.1983), this court questioned the continuing validity of *Hearst Radio* where an agency's statements are "concededly false...." 722 F.2d at 849; *see also Writers Guild of America, West, Inc. v. FCC*, 423 F.Supp. 1064 (C.D.Cal.1976) (multiple speeches that were extra-legal, yet deliberate agency method for regulating the industry, found reviewable); *cf. Independent Broker–Dealers' Trade Ass'n v. SEC*, 442 F.2d 132, 142, 143 (D.C.Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971) (court implies that APA review might be proper where agency publicity pressure, itself possibly *ultra vires*, leads party to take action that injures another).

The problem with *Hearst Radio*'s absolute immunity rule for agency publications is its failure to accommodate two separate goals of a fair administrative process: protecting parties from false or unauthorized agency news releases and promoting Congress' clear mandate that government information, particularly from consumer-oriented agencies, reach the public. Both NIOSH and the EPA are charged with protecting the public welfare through investigations and reports on health conditions. *See* Occupational Safety and Health Act, 29 U.S.C. §§ 669(a), (d), 671; Public Health Service Act, 42 U.S.C. §§ 241(a), 4321, 4364, 4366. And like the National Highway Traffic Safety Administration's defect notification practices, *see* 15 U.S.C. § 1412, or the FDA's warnings about poisonous foods, *see* 21 U.S.C. § 375, the NIOSH and EPA powers would be crippled were these agencies not permitted to use the quick and cheap instrument of publicity. The same agency access to publicity, however, can unjustifiably injure other parties. *See* Gellhorn, Adverse Publicity By Administrative Agencies, 86 Harv.L.Rev. 1380 (1973) (lengthy discussion of industry effects of agency publicity).[7] Though there is broad consensus that this potential for harm is best controlled by internal agency restraint—i.e., careful attention to the accuracy of, the need for, and alternatives to adverse publicity, *see, e.g.*, FTC Publicity Guidebook (agency guidelines on use of publicity)—where it does occur, courts have a duty to decide whether there

---

5. We do not consider the related issue of agency (notably Food and Drug Administration (FDA) or the Securities Exchange Commission (SEC)) press releases that announce the commencement of adjudicatory proceedings. *See FTC v. Cinderella Career & Finishing Schools, Inc.*, 404 F.2d 1308 (D.C.Cir.1968). *See generally*, Note, Disparaging Publicity By Federal Agencies, 67 Colum.L.Rev. 1512 (1967). The judicial and scholarly criticisms of these dissemination practices focus on the peril of prejudgment—a concern not present in this case.

6. *See, e.g.*, Lemov, Administrative Agency News Releases: Public Information Versus Private Injury, 37 Geo.Wash.L.Rev. 63, 78 (1968) (party to be affected by news release should be given statutory right of simultaneous rebuttal publication; Federal Tort Claims Act should be revised).

7. Cranberry growers and consumers alike will recall "Black Monday," November 9, 1959. On that day, the Secretary of Health, Education, and Welfare announced that cranberries from the Northwest had been found contaminated with a weed killer. Though later the government declared that 99% of the nation's crop was untainted, the Secretary said that his family would do without the berries at their Thanksgiving meal. Most Americans chose to make the same sacrifice, and by Christmas, the industry had a $20 million surplus of cranberries. Eventually, taxpayers assumed much of the loss through Farmers Home Loan Administration indemnity payments to cranberry growers. *See generally*, Gellhorn, *supra* at 1408–10 & nn. 116, 118. One lesson is clear: Adverse publicity can cause damage even though legal rights remain unaltered and even though the statements are not libelous or tortious.

is a remedy under the APA for the release of the information.

Appellants and the district court analyzed APA review in terms of whether the Guide was a "rule" reviewable as agency action. Before focussing on the Guide's status as an agency rule, however, we first canvass the APA's definition of agency actions to ascertain whether the Guide qualifies under another category that would justify judicial review.

Apart from "rule," "sanction" is the only other plausible category of agency action into which an agency's infliction of harm through publicity might fit. The term "sanction" is defined in the APA as

the whole or a part of an agency (1) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (2) withholding of relief; (3) imposition of penalty or fine; (4) destruction, taking, seizure, or withholding of property; (5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (6) requirement, revocation or suspension of a license; or (7) taking other compulsory or restrictive action.

5 U.S.C. § 551(10). Although legislative history was not discussed in *Hearst Radio,* Congress itself did note that in certain circumstances adverse publicity might operate as a sanction. H.Rep. No. 79–1980, 79th Cong., 2d Sess. (1946) (House of Representatives Report on APA) (noting that unauthorized use of publicity as penalty or punishment is "troublesome subject").

Thus, though adverse impact alone would not necessarily make agency publicity reviewable as a sanction, *see American Telephone & Telegraph Co. v. FCC,* 602 F.2d 401, 408 (D.C.Cir.1979), an agency intent on penalizing a party through adverse publicity, especially false or unauthorized publicity, might well merit a review of its action. This conclusion would be especially compelling if an information release caused "destruction ... of property," or "revocation ... of a license." 5 U.S.C. § 551(10). Because ISEA here offers neither evidence that the Guide was intended to penalize producers or consumers of the eleven lawful, but criticized respirators, nor evidence that the Guide is false, we find that the publication does not qualify as an agency sanction.

Instead, ISEA rests reviewability entirely on its characterization of the Guide as an agency rule. To adopt a substantive rule, an agency must comply with the APA's section 553 notice and comment requirements. Because no such rulemaking occurred in the present case, ISEA argues both that the Guide is invalid and that the district court's dismissal should be reversed. The EPA and NIOSH, on the other hand, contend that the Guide is not a substantive rule, that it is unreviewable, and, alternatively, that it did not require notice and comment proceedings. We hold that the facts support the district court's conclusion that the Guide does not qualify ·as agency action and hence is not reviewable.[8]

---

**8.** Even were we to find that the Guide represents an agency statement of policy, subject to section 551 review, ripeness doctrines would militate against our reaching the merits. *See Office of Communication of United Church of Christ v. FCC,* 826 F.2d 101, 105–06 (D.C.Cir. 1987) (nonbinding, prospective effect of policy statement makes it unripe for review). Discretionary agency positions are generally best not tested on review until the policy is actually applied to a specific fact situation. In this case, there is no evidence at all that the Guide will alter the EPA or NIOSH's regulatory behavior towards asbestos users or manufacturers, so the Guide would not even qualify as an agency statement of policy. In fact, unlike a statement of policy, *see Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir.1986) (citing cases that define statements of policy as indica-

tors of agencies' future intentions), the Guide in this case announces no rule-making that the EPA intends to initiate. Indeed, the EPA expressly disclaims the desire to impose on the industry the Guide's recommendations. *See* Brief of Appellees at 26. The EPA has expressed its views, not to presage any change in its own regulatory policy, but rather to urge the public to be more attentive to the asbestos hazard.

Of course, notice and comment procedures are unnecessary in the case of policy statements. 5 U.S.C. § 553(b)(A); *see also Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974) (FPC "Statement of Policy" exempt from rulemaking requirements because "[i]t is not finally determinative of the issues or rights to which it is addressed ... [but rather]

The APA defines rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." 5 U.S.C. § 551(4). Clearly Congress did not intend that the APA definition of a rule be construed so broadly that every agency action would be subject to judicial review. ISEA contends, however, that the "Guide takes the extra step necessary to make a 'report' an unlawful rulemaking; *i.e.,* it transcends the mere reporting of factual matters and attempts to change and implement law and policy within the statutory definition of rulemaking." Brief of Appellants at 27. The facts suggest otherwise, however. The Guide does not change any law or official policy presently in effect. It does not narrow or alter the grounds on which the NIOSH will act to certify any of the thirteen lawful respirator types. *Cf. Nader v. CAB,* 657 F.2d 453 (D.C.Cir.1981) (alleged policy statement is reviewable as rule when it narrowly limits agency discretion to act). Instead of repudiating the minimum protections prescribed in current regulations, the Guide offers a full ranking of all the lawful devices according to their effectiveness at protecting workers.[9] Pointing out unique features of the two most protective respirators, the Guide limits itself to recommending them as "the maximum feasible level of respiratory protection." J.A. at 153. Clearly, then, there is no effective repeal of the EPA or NIOSH's current legal obligation to approve for use all thirteen respirator devices. *See American Trucking Assoc., Inc. v. United States,* 755 F.2d 1292, 1296–97 (7th Cir.1985) (report that is "educational undertaking" and does not "impose an obligation, determine a right or liability or fix a legal relationship" is not reviewable agency action, in spite of allegations of revenue loss to parties resulting from report); *Kukatush Mining Corp. v. SEC,* 309 F.2d 647, 650 (D.C.Cir.1962) (Bazelon, C.J., dissenting on other grounds) (SEC

cautionary list does not determine legal rights, hence is unreviewable as agency rule); *cf. International Telephone & Telegraph Corp. v. Local 134,* 419 U.S. 428, 442–48, 95 S.Ct. 600, 609–12, 42 L.Ed. 2d 558 (1975) (agency process without binding effect, even if it leads to significant "practical consequences," is not reviewable under 5 U.S.C. § 551).

The advisory character of the NIOSH/EPA report is most evident when one examines the Guide. Starting with its conclusion that "no level of exposure [to asbestos] is known to be without risk," J.A. at 147, the Guide elaborates a model respiratory protection program for asbestos abatement operations. It emphasizes throughout that the model is an ideal, not a regimen presently mandated by law. The sections that immediately precede and follow the section marked "Respirator Selection," J.A. at 153, which appellants now protest, are illustrative. The preceding section concerning "Written Standard Operating Procedure" clearly states that federal regulations do not address the issue of how to operate respirators; nevertheless, the Guide vigorously recommends that the regulated industry itself provide exhaustive instructions to workers. And in the section that follows "Respirator Selection," the Guide is even more explicit in advocating voluntary industry protections above and beyond what is required by law: "In addition to existing regulatory requirements, the initial [medical] examination should allow determination as to whether the worker is capable of wearing and using a respirator." J.A. at 155. Similar examples of hortatory advice appear on every page.

Most important, in the section marked "Respiratory Selection," the EPA underscores the distinction between the present legal requirements and the current information that informs the Guide's recommen-

---

only announces what the agency seeks to establish as policy").

**9.** Despite its exhortation to choose the most protective devices, the EPA, in the text of the

Guide as well as in forms in the appendix, details how employers may select any of the thirteen lawful types. *See* J.A. at 153, 217–19.

dations.[10] In the subsection entitled "Respirators Allowable Under Existing Regulations for Protection Against Asbestos," where the EPA criticizes existing regulations for not providing maximum protection, there are repeated assurances that the less protective devices still satisfy OSHA and EPA regulations. J.A. at 156, 155 (pages reversed in Joint Appendix) (assurances made in three separate paragraphs).

Our conclusion that the Guide does not constitute an agency rule is reinforced by the fact that the Guide—a NIOSH/EPA "technical report"—was published neither in the Federal Register nor in the Code of Federal Regulations, which contains only documents "'having general applicability and legal effect.'" *See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C.Cir.1986) (agency "guidelines" on when to cite independent contractors for safety violations are held not to amount to rule because they do not have binding effect).

ISEA nonetheless relies on the alleged "substantial impact" of the Guide's criticisms on manufacturers of the disfavored respirators. We note first that this court has rejected the notion that the mere fact that an agency action has "substantial impact" "transform[s] it into a legislative rule." *See American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 560 (D.C.Cir.1983) (specifically applied to § 553 notice and comment requirements); 2 K. Davis, Administrative Law Treatise § 7:17, at 85 (1979) (D.C. Circuit does not adhere to substantial impact test to determine if agency pronouncement is rule under § 553). Second, publication of the Guide, which favors respirators that offer the maximum protection against asbestos, establishes no rule that the regulated industry must obey. In and of itself the Guide does not deny any rights to the appellants. Rather, any effect it might have on respirator manufacturers is indirect and arises from the reactions and choices of industry customers and workers.[11] Unions may stiffen their bargaining positions on safety precautions. Perhaps sales of several respirator types will decline; perhaps not, if appellants are correct in their view that the Guide's recommendations are unfounded. In any case, these repercussions from the dissemination of information designed to provide the industry with up-to-date safety recommendations do not convert the Guide into a reviewable rule or sanction. The district court correctly dismissed the action insofar as it was brought on APA grounds.

### B. *Due Process*

■ ISEA's constitutional claim is that the Guide's warning against the use of certain respirators will deprive appellants of property interests—notably the market value of the certifications of their respirators. Although parties mounting a constitutional challenge to government action

---

**10.** The Guide documents the research that underlies its ranking of respirators according to the extent of protection provided. *See* J.A. at 156 n. Presumably, in any rulemaking, the regulated industry would challenge these studies. ISEA did not, however, offer evidence in this proceeding to support its claim that the rankings are "unfounded," *see* Reply Brief of Appellants at 7, except to argue that in some circumstances the cumbersome outfits would be restrictive. The Guide acknowledges this limitation. *See* J.A. at 148. Because ISEA does not attack the Guide as false or misleading, we need not decide the question left open by this court in *Impro Products, Inc. v. Block*, 722 F.2d 845, 849 (D.C.Cir.1983), whether the intentional dissemination of false information constitutes agency action subject to review. *See supra* text accompanying notes 6 & 7.

**11.** Again, even if we found that the Guide's publication were a reviewable action, it would not follow that notice and comment were required. *Cf.* 2 K. Davis, Administrative Law Treatise § 7:20 (1979) (caution that miscellaneous informal agency action, such as "supervising, advising, applying pressure, publicizing [even though these activities may have "substantial impact"] ... rather clearly has to be generally free from any requirement of notice and comment proceedings"). Day-to-day informality and flexibility is indispensable to the agency function; moreover, agencies should not be deterred from producing information that will benefit the public. *Cf. Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980) (agency need not follow § 553 procedures in "information letters," though these statements often begin: "The staff's position is ...").

that stigmatizes them may not encounter the definitional rigidities of the APA, *see, e.g., SCA Services of Indiana, Inc. v. Thomas,* 634 F.Supp. 1355, 1376 (N.D.Ind. 1986) (Superfund listing may support due process challenge, even where APA status of listing is ambiguous), we do not find here that ISEA has proven that the Guide works a deprivation of property interests sufficient to support a fifth amendment violation.

To determine whether there has been an unlawful deprivation of a constitutionally protected property interest we make a three-part inquiry. First, is there a property interest? Second, did the government's action "deprive" appellants of this interest? And third, if so, were the persons deprived accorded due process protections?

There is no question that appellants possess cognizable property interests in their respirator certifications. *See Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971) (licenses are property interests that cannot be deprived without procedural due process). We do not find, however, that publication of the Guide *deprived* appellants of these interests. The ISEA's core error again is to assume that the Guide's disapproval of various respirators effectively repeals the agency's legal certification of these same items for industry use. The two agency actions are separate, and can coexist, however uneasily. The Guide's goal of maximum protection leaves intact the existing, minimum certification standards as well as the validity of all presently possessed certificates.[12] We. may be confident that industry buyers of asbestos-protection respirators are fully cognizant of this fact. Although ISEA offers a few affidavits from industry buyers who might shift to purchase the more protective devices, in no way has appellants' property been rendered valueless. The EPA and NIOSH have not revoked any certificates; rather, they have only introduced new information into the market with a possible effect on competition. This indirect effect on lawful certificate holders of information not demonstrated to be false can hardly be said to constitute a constitutional deprivation of property deserving fifth amendment protection. *See Wells Fargo Armored Serv. Corp. v. Georgia Pub. Serv. Comm'n,* 547 F.2d 938, 941 (5th Cir.1977).

Even were we to view the publication as a deprivation, the EPA and NIOSH are discharging their statutory duty to alert the public to potentially hazardous work conditions. Applying the three-part test of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), we note that the largely speculative industry claim of diminished respirator sales, coupled with no charge of falsity, is easily outweighed by the NIOSH and EPA's responsibility to inform American employers and workers alike of hazards to public health.

## CONCLUSION

The Guide was designed to advise and recommend to industry employers how to provide maximum asbestos protection to workers. It had no binding legal effect on either buyers or purchasers of certified respirators. Nor was it contemplated that the recommendations would be implemented in the context of future agency proceedings. Finally, appellants did not charge that the recommendations were false. Under these circumstances, the Guide did not amount to a rule reviewable as agency action or requiring APA rulemaking proceedings; nor did its issuance constitute a deprivation of property interests under the fifth amendment. The district court was correct in dismissing the complaint.

**12.** Appellants' reference to *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir.1983), is inapposite in that the licenses there were held to have been "effectively" revoked only after "base-

less, relentless prosecutions ... destroyed the value of plaintiffs' licensed business and forced them ultimately to give up their Class A [liquor] license...." *Id.* at 949.