**FLUE–CURED TOBACCO COOPERATIVE STABILIZATION CORPORATION, The Council for Burley Tobacco, Inc., Universal Leaf Tobacco Company, Incorporated, Philip Morris Incorporated, R.J. Reynolds Tobacco Company,**

and

**Gallins Vending Company, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

and

**Carol Browner, Administrator, Environmental Protection Agency, Defendants.**

No. 6:93CV00370.

United States District Court, M.D. North Carolina, Winston–Salem Division.

July 20, 1994.

James D. Blount, Jr., James K. Dorsett, Jr., Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Raleigh, NC, for plaintiffs Flue–Cured Tobacco Co-op Stabilization Corp. and Counsel for Burley Tobacco, Inc.

Keith Vaughn, Dewey W. Wells, Jeffrey Lee Furr, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, for plaintiffs Universal Leaf Tobacco Co., Inc., Philip Morris Inc. and R.J. Reynolds Tobacco Co.

Richard B. Howington, Allman, Spry, Humphreys & Leggett, P.A., Winston–Salem, NC, for plaintiff Gallins Vending Co.

Benjamin H. White, Jr., John W. Stone, Jr., Office of U.S. Atty., Greensboro, NC, Myles E. Flint, U.S. Dept. of Justice, Environmental & Natural Resources Div., John Copeland Nagle, U.S. Dept. of Justice, Environmental Resources Div., Environmental Defense Section, Laura H. Neuwirth, U.S. E.P.A., Office of Gen. Counsel, Gerald H. Yamada, U.S. E.P.A., Acting Gen. Counsel, Gregory B. Foote, U.S. E.P.A., Asst. Gen. Counsel, Alice L. Mattice, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, for defendants U.S. E.P.A. and Carol Browner.

George M. Cleland, Winston–Salem, NC, Cornish F. Hitchcock, Alan B. Morrison, Public Citizen Litigation Group, Matthew L. Myers, Asbill, Junkin & Myers, Chartered, Washington, DC, for movants American Lung Ass'n, American Heart Ass'n, American Cancer Soc. and American Public Health Ass'n and Public Citizen.

Diana Evans Ricketts, Bode, Call & Green, Raleigh, NC, Daniel J. Popeo, Richard A. Samp, Washington Legal Foundation, Washington, DC, for movant Washington Legal Foundation.

*MEMORANDUM OPINION*

OSTEEN, District Judge.

This case involves an action for declaratory and injunctive relief brought against the U.S. Environmental Protection Agency ("EPA") by various tobacco production and distribution interests, including growers, marketers

and dealers, cigarette manufacturers, and a cigarette vending machine company. Plaintiffs challenge the issuance of a report by EPA classifying environmental tobacco smoke ("ETS") as a known human carcinogen. The case is presently before this court on EPA's motion to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is proper pursuant to 28 U.S.C. § 1391(e). Declaratory relief is authorized by 28 U.S.C. § 2201. After consideration of each side's thorough and most helpful briefs and corresponding *amicus curiae* briefs, the court has determined that oral argument is not necessary. At this time, for the reasons stated below, the court will deny EPA's motion to dismiss on Counts I, II, and III, and will defer its ruling on Count IV.

## I. BACKGROUND

### A. Statutory and Factual History

In 1986, Congress passed the Radon Gas and Indoor Air Quality Research Act. Pub.L. 99–499, §§ 401–405, 100 Stat. 1758, *reprinted in* 42 U.S.C. § 7401 note ("the Radon Act" or "the Act"). The Radon Act required the Administrator of the EPA to establish a research program designed in part to gather data and information on all aspects of indoor air quality and to assess appropriate federal government actions to reduce the health risks associated with indoor air quality problems. *Id.* § 403(a). Mandated elements of the program included research and development concerning the identification, characterization, and monitoring of indoor air pollution; research relating to the health effects on humans of indoor air pollution; demonstration of methods for reducing or eliminating indoor air pollution; and the dissemination of information to assure the public availability of the findings of the research program. *Id.* § 403(b). Congress also required the Administrator to establish a committee of federal agency representatives and an advisory group of individuals representing state, scientific, industrial, and public interests to assist her in implementing the research program. *Id.* § 403(c). Congress, however, prohibited the Administrator from carrying out any regulatory program or any activity other than the research, development, and reporting or information dissemination specified in the Act, although she was not prohibited from doing so under the authority of any other law. *Id.* § 404.

In January 1993, pursuant to the authority conferred upon it by the Radon Act and after public review of and comment on two drafts,[1] EPA formally released a report evaluating the human health effects of ETS.[2] Office of Health & Envtl. Assessment, U.S. Envtl. Protection Agency, *Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders* xvi (EPA/600/6–90/006F Dec. 1992) ("the Report"). According to EPA, the Report, which is intended to be "a useful guide for policy makers and citizens everywhere," represents the most recent scientific assessment of the health effects of ETS and the first conducted by EPA itself. It "confirms and strengthens" two prior government reports,[3] "and provides important new documentation of the emerging scientific consensus that tobacco smoke is not just a health risk for smokers." *Id.* at xv.

The Report's primary general finding is that "the widespread exposure to [ETS] in the United States presents a serious and substantial public health impact." *Id.* at 1–1, 6–32. More specifically, the Report "demonstrates conclusively" that ETS increases the risk of lung cancer in healthy nonsmokers. *Id.* at xv. One of its primary specific findings is that ETS is responsible for approximately 3,000 lung cancer deaths annually in U.S. nonsmokers. *Id.* at 1–1, 1–4; *see gener-*

---

1. *See* Notice of Availability of External Review Draft, 55 Fed.Reg. 25,874 (1990); Notice of Open Meeting of Scientific Advisory Board Indoor Air Quality and Total Human Exposure Committee, 55 Fed.Reg. 48,287 (1990); Notice of Open Meeting of Scientific Advisory Board Indoor Air Quality and Total Human Exposure Committee, 57 Fed.Reg. 27,772 (1992).

2. ETS is also known as passive, secondary, secondhand, or sidestream smoke.

3. *See* National Research Council, *Environmental Tobacco Smoke: Measuring Exposures and Assessing Health Effects* (1986); Office of Smoking & Health, U.S. Dep't of Health & Human Servs., *The Health Consequences of Involuntary Smoking: A Report of the Surgeon General* (DHHS Pub. No. (PHS) 87–8398 1986).

*ally id.* at 6–1–6–31. The Report's most important conclusion, and the one challenged in this action, is that ETS is a Group A (known human) carcinogen. *Id.* at 1–1, 1–4, 5–68. The Report also concluded that ETS exposure in children is causally associated with an increased risk of lung infections, a reduction in lung function, and an increased risk of asthma. *Id.* at 1–1, 1–5–1–6; *see generally id.* at 7–1–8–16.

### B. The Complaint

On June 22, 1993, Flue–Cured Tobacco Cooperative Stabilization Corporation, The Council for Burley Tobacco, Universal Leaf Tobacco Company, Philip Morris Incorporated, R.J. Reynolds Tobacco Company, and Gallins Vending Company filed a complaint in this court challenging the legality of EPA's Report and its classification of ETS as a known human carcinogen. Plaintiffs allege that EPA, in conducting its research and arriving at its conclusion, manipulated and "cherry-picked" data, ignored critical statistical studies and chemical analyses, failed to account for confounding factors and sources of bias, violated basic statistical principles designed to minimize the possibility that an apparent association is due to chance, and generally altered EPA's usual models, assumptions, and methodologies when their use would not support the Agency's desired conclusions. Plaintiffs also allege that EPA issued the Report and classification with the intent that they would have a substantial regulatory impact that would result in the restriction of smoking in the workplace and in public. Plaintiffs further allege that, in fact, the Report has had a substantial regulatory impact, as evidenced by, among other examples, the U.S. Postmaster's order of a nationwide ban on smoking in postal facilities and the introduction in Congress of legislation that would prohibit smoking in all buildings owned or leased by federal agencies. Finally, Plaintiffs allege that the release of the Report has caused them substantial and immediate harm, including false disparagement of their product and loss of business and economic goodwill.

On the basis of these allegations, the Complaint presents four claims. Count I, charging a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C), alleges that EPA has exceeded the authority granted to it under the Radon Act, both because the classification of ETS as a Group A carcinogen does not constitute research permitted under the Act and because EPA has not established the advisory group mandated by the Act or used the agency representative committee to assist it in its research. Count II alleges that the classification of ETS as a known human carcinogen is arbitrary and capricious, 5 U.S.C. § 706(2)(A), because EPA violated its internal scientific guidelines and because EPA ignored data contrary to its conclusions and based its conclusions on models, assumptions, and methods that are inaccurate, flawed, and not accepted by the scientific community. Count III charges a violation of 5 U.S.C. § 706(2)(D), that agency findings and conclusions are to be set aside if arrived at without observance of procedures required by law, again on the ground that EPA did not follow its guidelines when classifying ETS. Finally, Count IV charges that EPA's failure to comply with the Radon Act and agency guidelines constitutes a violation of Plaintiffs' right to due process under the Fifth Amendment. For each count, Plaintiffs seek relief in the form of a declaratory judgment that the issuance of the Report and the classification of ETS as a known human carcinogen are unlawful. Plaintiffs also seek an injunction ordering EPA to withdraw the Report and the classification.

## II. DISCUSSION

### A. Administrative Procedure Act Claims

■ 1. Standard of Review Under Rule 12(b)(1): In addressing Defendants' challenge to Plaintiffs' APA claims under Rule 12(b)(1) (subject matter jurisdiction), the court will read the Complaint as a whole and will construe it broadly and liberally. Unlike a 12(b)(6) review, however, the court will not draw argumentative inferences in favor of Plaintiffs. Finally, the court will consider all uncontroverted factual allegations to be true, but will not accept unsupported conclusions of law. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, at 218–20 (2d ed. 1990); *id.* § 1363.

■ 2. Reviewability Under the APA: Section 702 of the Administrative Procedure Act provides that "[a] person suffering legal

wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." This right of review is refined in § 704: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." The Supreme Court has hospitably interpreted these generous provisions to create a presumption of judicial review, noting that the legislative history of the APA "manifests a congressional intention that it cover a broad spectrum of administrative actions...." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *see Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986).

In keeping with this presumption of reviewability, the definition of "agency action" under the APA is likewise broad. " '[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act...." 5 U.S.C. § 551(13). The Supreme Court, again relying on congressional intent, has given that definition a similarly expansive interpretation.

> The term "agency action" brings together previously defined terms in order to simplify the language of the judicial-review provisions ... *and to assure the complete coverage of every form of agency power, proceeding, action, or inaction.* In that respect the term includes the supporting procedures, findings, conclusions, or statements or reasons or basis for the action or inaction.

*Federal Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 492 n. 7, 66 L.Ed.2d 416 (1980) (quoting S.Doc. No. 248, 79th Cong., 2d Sess. 255 (1946)) (emphasis added).

Against this background, the court must now address whether it has jurisdiction under the APA to review the Report and classification of ETS. Because the Radon Act

does not expressly permit judicial review of agency acts taken pursuant to its authority, the court must determine if the Report and classification[4] constitute "final agency action." *See* 5 U.S.C. § 704. This inquiry involves two questions: First, do the Report and classification constitute agency action; and second, if they do, is that action final for purposes of judicial review?

3. Do the Report and Classification Constitute Agency Action? In answering this question, the court makes the following preliminary observations. First, the court will take a pragmatic approach to its determination, just as it would in determining the finality of an action or the ripeness of a case. *See Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n*, 710 F.2d 1165, 1170 (6th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984); *Independent Broker–Dealers' Trade Ass'n v. Securities & Exch. Comm'n*, 442 F.2d 132, 140–41 (D.C.Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971). Closely related to this observation is the second, that the court must look to the substance of the agency activity and its effects, not to the label applied to it (or lack thereof). *See Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816 (D.C.Cir.1983); *Chamber of Commerce of United States v. Occupational Safety & Health Admin.*, 636 F.2d 464, 468 (D.C.Cir.1980); *see also* 5 U.S.C. § 551(13) (agency action includes *the equivalent* of rules, orders, sanctions, etc.).

The court finds that the issuance of the Report and classification do constitute agency action for the following reasons. First, the terms of the Radon Act require the EPA Administrator to conduct research concerning the identification and characterization of sources of indoor air pollution and research relating to the health effects of that pollution on human health. The Act further requires the Administrator to disseminate information to assure the public availability of the findings of such research. Thus, the Administrator has a congressional mandate to issue the Report and classification. At the outset, she can exercise no discretion, the

---

4. For purposes of analysis, the court will treat the Report and the classification of ETS as one and the same. Although Defendants analyze them separately, the court believes that they are

inseparable: The Report has little purpose without the classification, and the classification has little substance or meaning without the Report.

hallmark of unreviewable agency action. *See* 5 U.S.C. § 701(a)(2).

Second, the court takes judicial notice of the fact that during the production of the Report, EPA submitted the first draft for public review and comment and submitted both the first and the second drafts to review by a scientific advisory committee in hearings open to the public. The Agency published notices regarding these events in the Federal Register. Notice of Availability of External Review Draft, 55 Fed.Reg. 25,874 (1990); Notice of Open Meeting of Scientific Advisory Board Indoor Air Quality and Total Human Exposure Committee, 55 Fed.Reg. 48,287 (1990); Notice of Open Meeting of Scientific Advisory Board Indoor Air Quality and Total Human Exposure Committee, 57 Fed.Reg. 27,772 (1992). Although the Report and classification were not designated as a rule, the notice-and-comment procedure used by EPA otherwise follows that required for informal rulemaking. *See* 5 U.S.C. § 553. As well, although the final version of the Report was not itself published in the Federal Register or in the Code of Federal Regulations, it was released and the classification announced by the Administrator in a highly-publicized ceremony. The use of such procedures would suggest that EPA intended the Report and classification to have a regulatory effect, as Plaintiffs have alleged. (Complaint ¶¶ 2, 81.)

Third, the Report and classification have in fact had a regulatory effect, albeit an indirect one.[5] The Complaint states that the U.S. Postmaster General ordered a nationwide ban on smoking in postal facilities. (Complaint ¶ 87(a).) The court also takes judicial notice of the fact that the General Services Administration ("GSA") now prohibits the use of tobacco products in its Interagency Fleet Management System motor vehicles. GSA based its decision to issue its regulation explicitly upon the health concerns expressed in the Report. Final Rule: Use and Care of GSA Interagency Fleet Management System Vehicles, 58 Fed.Reg. 63,531 (1993).[6] As well, GSA has indicated that it will revise its current smoking policy in buildings controlled by it to address the EPA findings. 59 Fed.Reg. 21,187. Further, the Occupational Safety and Health Administration ("OSHA") has instituted rulemaking procedures to adopt standards addressing indoor air quality in work environments, standards which will focus in large part upon ETS. Notice of Proposed Rulemaking: Indoor Air Quality, 59 Fed.Reg. 15,968 (1994).

Finally, the court notes that this case bears a striking resemblance to another case in which the trial court found that it had authority to review a government report. *See Synthetic Organic Chemical Manufacturers Ass'n ["SOCMA"] v. Secretary, Dep't of Health & Human Servs.*, 720 F.Supp. 1244 (W.D.La.1989). In *SOCMA*, the plaintiffs sought an injunction to prevent the Secretary of the Department of Health and Human Services from listing several chemicals in the Department's *Annual Report on Carcinogens* without first considering certain relevant evidence. As in the case now before the court, the Secretary was required by Congress to classify chemical substances as known or possible carcinogens and to publish his determinations in an annual report. *Id.* at 1246–47; *see* 42 U.S.C. § 241(b)(4). Likewise, the report at issue in *SOCMA* was informational and imposed no obligations or sanctions.[7] 720 F.Supp. at 1249. Nonetheless, the *SOCMA* court found that publication of the report was reviewable agency action for two reasons. First, the courts have be-

---

**5.** Due to the prohibition of regulatory action contained in the Radon Act, any regulatory effect of an act carried out under the authority of the Radon Act must, of necessity, be indirect. Therefore, the court does not find the indirect effect of the Report and classification to be fatal to the Complaint.

**6.** The court disagrees with Defendants' contention that no entity or individual need "pay the slightest heed" to the Report or the classification. (Defs.' Mem.Supp.Mot. Dismiss at 17.) If this were true, then there is no point to their issuance. The documents would constitute a useless gesture. The court declines to believe that

Congress could or would have intended such a result when it passed the Radon Act.

**7.** In contrast to this case, however, the inclusion of a chemical in the Annual Report did automatically trigger a series of other regulatory actions. *SOCMA*, 720 F.Supp. at 1248. Although the Report at issue here does not automatically require other action, it is nonetheless clearly intended under the Radon Act to identify sources of indoor air pollution and to assist other regulatory agencies in setting priorities for action. *Id.* at 1249; *see* Radon Act § 403(a)(2)–(3), (b)(1), (b)(5), *reprinted in* 42 U.S.C. § 7401 note.

come increasingly sensitive to the need in certain cases to review administrative actions even when they do not create direct obligations or have enforcement effect. *Id.* (citations omitted). Second, in keeping with the pragmatic approach to determining what constitutes agency action, the court recognized the "moral suasion" of the carcinogen report. This court agrees that "it takes little knowledge of the goings-on about us to be aware that 'moral suasion' is a considerably potent force in our society. . . ." *Id.* at 1250 (internal quotations and citations omitted). The "moral suasion" in this case is especially strong given the emotionally charged nature of the debate over smoking and the general public's tendency to panic at the slightest association of any product with cancer. What the government does with identifying ETS as a carcinogen unquestionably will have far-reaching consequences.

In contrast, the primary case relied upon by Defendants, although superficially similar, contains important differences from the instant case that render it less persuasive than *SOCMA. See Industrial Safety Equipment Ass'n, Inc. ["ISEA"] v. Environmental Protection Agency,* 837 F.2d 1115 (D.C.Cir.1988), *aff'g* 656 F.Supp. 852 (D.D.C.1987). In taking a narrow and legalistic analytical approach to the question before it, the D.C. Circuit found that the publication of a guide by EPA and the National Institute for Occupational Safety and Health ("NIOSH") which recommended the use of certain asbestos-protection respirators over others did not constitute agency action. The guide, however, was quite different from the Report at issue in this case.

To begin, the guide was descriptive, emphasizing an ideal, 837 F.2d at 1120; therefore it was advisory. In contrast, the Report is declaratory: It states that ETS *is* a known human carcinogen and backs up its statement through scientific data purportedly analyzed in accordance with agency procedural

guidelines. Next, the NIOSH guide was not issued under a specific statutory authorization to distribute the information, *see* 656 F.Supp. at 855, whereas the Report was issued under such authority. In addition, the Report was issued pursuant to notice-and-comment procedures; this court's research indicates that the guide was not so issued. Further, the Report has been used to justify regulations by other agencies; again, this court's research yields no example of such a use of the guide. Finally, the D.C. Circuit implied that its decision might have come out differently had the agency issued the guide with the intent of penalizing a party, especially if the information contained in the guide were false. *See* 837 F.2d at 1119. This case presents just that situation, as Plaintiffs have alleged that "[t]he classification of ETS as a Group A carcinogen was intended to and in fact did falsely disparage plaintiffs' products. . . ." (Complaint ¶ 86.)[8]

■ 4. Do the Report and Classification Constitute Final Agency Action? Having concluded that the Report and classification constitute agency action, the court must now decide if that action is final for purposes of judicial review. Once again, the court will take a pragmatic approach, as well as a flexible view of finality, in making its determination and will consider several questions: (1) is the agency action definitive; (2) does the action have direct or immediate legal force or practical effect; (3) are the questions at issue purely legal or otherwise fit for judicial resolution; and (4) would immediate judicial review foster agency and judicial efficiency? *Federal Trade Comm'n v. Standard Oil Co. of Cal.,* 449 U.S. 232, 239–40, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980). In answering these questions, the court finds that the action is final.

First, the agency action is definitive. The Report itself concludes that ETS *is* in fact a known human carcinogen, not merely that ETS might be a carcinogen. Nor does the

---

**8.** The other case on which Defendants rely heavily is similarly distinguishable. In *American Trucking Ass'n v. United States,* 755 F.2d 1292 (7th Cir.1985), the Interstate Commerce Commission issued a report during the period of trucking deregulation that "purport[ed] to be an educational undertaking toward the end that 'a greater understanding may be gained of the pricing techniques now being developed by the truck-

ing industry.'" *Id.* at 1296. The Commission did not issue the report under any statutory authority; rather, it did so because a Commission member, in a concurring opinion in a rate petition decision, indicated that the Commission had agreed to develop a policy statement. *Id.* at 1295. Simply put, the report at issue in *American Trucking* is quite different from the report at issue in this case.

Report simply recommend that ETS be so classified, thereby leaving the actual classification to another regulatory body. As then-Administrator William Reilly is alleged to have stated at the ceremony publicizing the Report's release, "the government has spoken on the question." (Complaint ¶ 80.) In comparison, the complaint at issue in the *Standard Oil* case was deemed not to be definitive because it averred that the Federal Trade Commission had "reason to believe" that the defendant was violating the Federal Trade Commission Act. As the Supreme Court observed, the complaint merely represented a threshold determination that further inquiry was warranted. 449 U.S. at 241, 101 S.Ct. at 493.

Second, the Report has had direct practical effects on Plaintiffs. Plaintiff Gallins Vending Company has been asked to remove its cigarette machines from various premises. (Complaint ¶ 86.) As the court noted previously, the General Services Administration has prohibited the use of tobacco products in government vehicles. It is not mere speculation to think that such actions, when combined with similar actions, will lead to decreased sales of cigarettes and, therefore, other forms of tobacco. (*Id.*)

The court acknowledges that the Report and classification do not themselves create any legal rights or obligations, and further finds this omission problematic. Given the pragmatic approach to finality approved by the Supreme Court, however, this court believes that the failure of the agency action to create legal rights or obligations is not dispositive of the finality issue. This is so because the organic statute at issue in this case is not typical of those under which authority an agency would normally promulgate regulations and orders. Under the terms of the Radon Act, the EPA Administrator is expressly prohibited from taking regulatory action. Therefore, she cannot create legal rights or obligations. The Act permits EPA to do no more than conduct research and publish the results, which is what it has done. Within the confines of the Radon Act, then, this action must be deemed to be final.

The third question focuses on the fitness of the issues in the case for judicial review. One issue, whether the Administrator acted within the scope of the Radon Act, involves an interpretation of what the Act permits and is therefore a legal issue. The other major issue, whether EPA followed its internal guidelines in formulating the Report, involves both factual and legal issues. Because the factual issues involve actions that are complete, their resolution is not dependent upon any future action. Further, although the factual issues will involve complicated and highly technical scientific evidence, that fact by itself does not preclude judicial review. *See, e.g., Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 35-37 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Finally, because Defendants have made no mention of any failure of Plaintiffs to exhaust administrative remedies, the court will assume that there are none to be exhausted and that therefore the court need not withhold review pending the development of an administrative record. Review by this court thus would not "disrupt the orderly process of adjudication." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

Finally, the court must determine if immediate judicial review would foster agency and judicial efficiency. The court believes that permitting the suit to continue will do so. EPA has indicated that it plans no further action in connection with the Report and classification, (Complaint ¶ 85(c); Answer ¶ 85); thus, judicial review now would not interfere with agency plans concerning them. As well, it would be more efficient to determine the validity of the Report and classification before more agencies promulgate regulations based on them that could be subject to invalidation if the Report and classification were to be found improper.

■ 5. Are the APA Claims Ripe for Review? Although the court has determined that the Report and classification constitute final agency action, the court must additionally determine if the case is otherwise ripe for review. The rationale behind this requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

In making its determination, the court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. These considerations break down into four specific inquiries that essentially mirror the factors considered in determining "final agency action." They are: (1) whether the issues presented are purely legal; (2) whether the challenged action constitutes "final agency action"; (3) whether the challenged action has or will have a direct and immediate impact upon Plaintiffs; and (4) whether the resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency. *See id.* at 149–54, 87 S.Ct. at 1515–18.

Applying these criteria to the instant case, the court finds on balance that the case is ripe for review. Because the criteria for ripeness are effectively the same as the criteria for finality, the court will not repeat the reasoning that it has already explained in detail.

**B. Due Process Claim**

The determination of the legal sufficiency of Plaintiffs' claim under the Due Process Clause of the Fifth Amendment (Count IV) should be deferred until the next dispositive stage of litigation. *See* Fed.R.Civ.P. 12(d). This claim can be adjudicated more accurately after the parties have developed the factual record. The pendency of this claim will not significantly affect the scope of discovery that will be permitted on the claims that have been found to state a legal cause of action.

**III. CONCLUSION**

Having found that the Complaint states causes of action under the Administrative Procedure Act in that the Report and classification constitute final agency action that is ripe for judicial review, the court will deny Defendants' motion to dismiss as to Counts I, II, and III. As to Count IV, the court will defer its ruling until a factual record has been developed.

An order in accordance with this memorandum opinion will be filed contemporaneously herewith.