PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FLUE-CURED TOBACCO COOPERATIVE
STABILIZATION CORPORATION; UNIVERSAL
LEAF TOBACCO COMPANY,
INCORPORATED; PHILIP MORRIS,
INCORPORATED; RJ REYNOLDS TOBACCO
COMPANY; GALLINS VENDING COMPANY,
                    *Plaintiffs-Appellees,*

and

COUNCIL FOR BURLEY TOBACCO,
INCORPORATED; BROWN & WILLIAMSON
TOBACCO CORPORATION,
                              *Plaintiffs,*

v.                                                    No. 98-2407

THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; CAROL M.
BROWNER, Administrator,
Environmental Protection Agency,
                    *Defendants-Appellants,*

PUBLIC CITIZEN; AMERICAN HEART
ASSOCIATION; AMERICAN CANCER
SOCIETY; AMERICAN COLLEGE OF CHEST
PHYSICIANS; AMERICAN COLLEGE OF
PREVENTIVE MEDICINE; NATIONAL
CENTER FOR TOBACCO-FREE KIDS;
WASHINGTON LEGAL FOUNDATION,
                              *Amici Curiae,*

and

AMERICAN PUBLIC HEALTH ASSOCIATION;
AMERICAN LUNG ASSOCIATION,
                              *Movants.*

FLUE-CURED TOBACCO COOPERATIVE
STABILIZATION CORPORATION;
COUNCIL FOR BURLEY TOBACCO,
INCORPORATED; UNIVERSAL LEAF
TOBACCO COMPANY, INCORPORATED;
PHILIP MORRIS, INCORPORATED; RJ
REYNOLDS TOBACCO COMPANY; GALLINS
VENDING COMPANY; BROWN &
WILLIAMSON TOBACCO CORPORATION,
                    *Plaintiffs-Appellants,*

v.

THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; CAROL M.
BROWNER, Administrator,
Environmental Protection Agency,
                    *Defendants-Appellees,*

PUBLIC CITIZEN; AMERICAN HEART
ASSOCIATION; AMERICAN CANCER
SOCIETY; AMERICAN COLLEGE OF CHEST
PHYSICIANS; AMERICAN COLLEGE
PREVENTIVE MEDICINE; NATIONAL
CENTER FOR TOBACCO-FREE KIDS;
WASHINGTON LEGAL FOUNDATION,
                    *Amici Curiae,*

and

AMERICAN PUBLIC HEALTH ASSOCIATION;
AMERICAN LUNG ASSOCIATION,
                              *Movants.*

No. 98-2473

Appeals from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
William L. Osteen, District Judge.
(CA-93-370-6)

Argued: June 7, 1999

Decided: December 11, 2002

Before WIDENER and MOTZ, Circuit Judges, and
Malcolm J. HOWARD, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

---

Vacated and remanded by published opinion. Judge Widener wrote
the opinion, in which Judge Motz and Judge Howard concurred.

---

### COUNSEL

**ARGUED:** David Carlisle Shilton, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Appellants. Murray
Richard Garnick, ARNOLD & PORTER, Washington, D.C., for
Appellees. **ON BRIEF:** Lois J. Schiffer, Assistant Attorney General,
Environment & Natural Resources Division, Alice L. Mattice, Greer
S. Goldman, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C.; John W. Stone, Jr., Assistant United States Attor-
ney, Greensboro, North Carolina; Gregory B. Foote, Steven Silver-
man, ENVIRONMENTAL PROTECTION AGENCY, Washington,
D.C., for Appellants. Thomas Davis Sydnor, II, ARNOLD & POR-
TER, Washington, D.C.; Douglas W. Davis, HUNTON & WIL-
LIAMS, Richmond, Virginia, for Appellees. Colette G. Matzzie,
David C. Vladeck, Alan B. Morrison, PUBLIC CITIZEN LITIGA-
TION GROUP, Washington, D.C., for Amici Curiae Public Citizen,
et al. Daniel J. Popeo, Richard A. Samp, WASHINGTON LEGAL
FOUNDATION, Washington, D.C., for Amicus Curiae Foundation.

**OPINION**

WIDENER, Circuit Judge:

This case involves a challenge to the Environmental Protection Agency's (EPA) 1993 Report that classified environmental tobacco smoke[1] as a known human carcinogen. On appeal, EPA presents five arguments challenging the district court's decision that EPA violated its statutory obligations under the Radon Gas and Indoor Air Quality Research Act (Radon Act), Pub. L. No. 99-499, §§ 401-405, 100 Stat. 1758 (*reprinted in* 42 U.S.C. § 7401 note).[2] First, EPA argues that the district court incorrectly held that the Report was reviewable final agency action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 704. Second, EPA contends the district court erroneously concluded that plaintiffs—Flue-Cured Tobacco Cooperative Stabilization Corporation, Council for Burley Tobacco, Universal Leaf Tobacco Company, Phillip Morris Incorporated, R.J. Reynolds Tobacco Company, and Gallins Vending Company (collectively plaintiffs)—had proper standing to challenge EPA's Report. Third, EPA contends that it complied with section 403(c) of the Radon Act which required, among other things, that EPA appoint an industry representative to serve on an advisory group during EPA's research program regarding secondhand smoke. Fourth, EPA argues that even if it violated the Radon Act's mandate to establish properly an advisory committee for consultation, that error was nonetheless harmless and not grounds for vacating EPA's Report. Finally, EPA contends that the district court improperly exceeded the scope of judicial review of agency action by engaging in an intrusive review of the scientific and methodological judgments underlying EPA's conclusions in the Report.

Because the Report is not reviewable agency action under the APA, we vacate the judgment of the district court and remand for dismissal.[3]

---

[1]Such smoke is also known as secondhand, passive, secondary, or sidestream smoke.

[2]The Radon Act has not been codified.

[3]In their cross-appeal (Br. p.60), the plaintiffs ask that if we vacate the judgment of the district court, we send the case back for a new trial on

## I.

Congress enacted the Radon Act in 1986 as part of Title IV of the Superfund Amendments and Reauthorization Act of 1986. The Radon Act was based on Congress's finding that "exposure to naturally occurring radon and indoor air pollutants poses public health risk[s]" and that "[f]ederal radon and indoor air pollutant research programs are fragmented and underfunded," and thus a need existed for the development of an "information base concerning exposure to radon and indoor air pollutants." § 402, 100 Stat. at 1758.

The Radon Act required EPA's Administrator to establish a research program designed to collect data on indoor air quality, coordinate public and private research and development efforts, and to evaluate potential government actions to reduce health risks associated with indoor air quality problems. § 403(a), 100 Stat. at 1758-59.[4]

---

the ground that the EPA violated § 404 of the Radon Act because the Report at issue here is "for the purpose of compelling regulation." Along the same line, the plaintiffs ask that we send the case back for a new trial under their claim that the Report is *de facto* regulation.

Each of these claimed positions is without merit. Our opinion in this case makes it clear that Congress, in § 404 of the Radon Act, forbade regulatory action to the EPA, as we have set forth in some detail in the body of this opinion. The same reasoning applies to the plaintiffs' claim of *de facto* regulation. Giving effect to some kind of *de facto* regulation not authorized by statute would upset the entire regulatory scheme, as we have also set forth in the body of the opinion.

So far as the district court held that the action of the EPA was regulatory action, we vacate its decision.

[4]The Act provides:

(a)   Design of Program.—[The EPA] shall establish a research program with respect to radon gas and indoor air quality. Such program shall be designed to—

(1)   gather data and information on all aspects of indoor air quality in order to contribute to the understanding of health problems associated with the existence of air pollutants in the indoor environment;

(2)   coordinate Federal, State, local, and private research and development efforts relating to the improvement of indoor air quality; and

The statute required several elements of the research program that included: research and development concerning the identification, characterization, and monitoring of indoor air pollution; research relating to indoor air pollution's effects on human health; and public dissemination of the findings of the research program. § 403(b), 100 Stat. at 1759.[5] The Radon Act also required EPA to establish two advisory committees to assist EPA in conducting the statutory research program. For one committee, Congress directed EPA to establish an advisory committee containing representatives of federal agencies concerned with various aspects of indoor air quality. § 403(c), 100 Stat. at 1759. The second advisory committee was to contain "individuals representing the States, the scientific community, industry, and public interest organizations." § 403(c), 100 Stat. at 1759. Congress, however, explicitly forbade to EPA any regulatory authority under the Act and limited EPA's authority to research, development, and related reporting, and coordination activities. § 404, 100 Stat. at 1760 (stating "[n]othing [in the Act] shall be construed to authorize the [EPA] to carry out *any* regulatory program or *any* activity other than research, development, and related reporting, infor-

---

> (3)   assess appropriate Federal Government actions to miti-gate the environmental and health risks associated with indoor air quality problems.

§ 403(a), 100 Stat. at 1759.

[5]The Act provides:

> (b)   Program requirements.—The research program required under this section shall include—

> (1)   research and development concerning the identifica-tion, characterization, and monitoring of the sources and levels of indoor air pollution . . .

> (2)   research relating to the effects of indoor air pollution and radon on human health;

> . . .

> (6)   the dissemination of information to assure the public availability of the findings of the activities under this sec-tion.

§ 403(b), 100 Stat. at 1759.

mation dissemination, and coordination activities specified" in the Radon Act) (italics added).

On January 7, 1993, pursuant to its statutory authority under the Radon Act, EPA formally issued a report entitled *Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders*, (the Report) that analyzed the effects of secondhand smoke on human health. EPA described its Report as the most recent scientific assessment of the health risks of secondhand smoke and that it "provide[d] important new documentation of the emerging scientific consensus that tobacco smoke is not just a health risk for smokers." According to EPA, the Report conclusively demonstrated that such smoke increased the risk of lung cancer in healthy nonsmokers. The Report stated that it is annually responsible for approximately 3,000 nonsmoker, lung cancer deaths in the United States and categorized secondhand smoke as a Group A (known human) carcinogen.

## II.

On June 22, 1993, plaintiffs filed a four-count complaint challenging the legality of the Report and classification of secondhand smoke as a known human carcinogen. In Count I, plaintiffs alleged that the Report constituted regulatory action in violation of section 404 under the Radon Act and that EPA failed to establish properly an advisory committee pursuant to section 403(c). Count II alleged that EPA's decision to classify secondhand smoke as a human carcinogen was arbitrary and capricious. Count III charged that EPA violated the APA by failing to comply with EPA's internal Risk Assessment Guidelines. Finally, Count IV alleged that the Report violated the Due Process Clause of the United States Constitution by contravening the Radon Act and disregarding EPA's Risk Assessment Guidelines. Plaintiffs sought a declaratory judgment that the Report and the classification of ETS as a known human carcinogen were unlawful and an injunction ordering EPA to vacate the Report.

EPA initially filed a Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure contending that the district court lacked jurisdiction to hear the complaint because the Report was not reviewable final agency action under the APA. On July 20, 1994, the district court denied EPA's motion holding that

although the Report was informational and imposed no direct legal obligations or sanctions, it nonetheless was final agency action because it was definitive, had immediate practical effects, and immediate judicial review would foster agency and judicial efficiency. See *Flue-Cured Tobacco Coop. Stabilization Corp. v. United States EPA*, 857 F. Supp. 1137, 1140-45 (M.D.N.C. 1994).

EPA then filed a Motion for Judgment on the Pleadings arguing that plaintiffs lacked proper standing to challenge the Report. On May 23, 1995, the district court denied this motion ruling that EPA's Report caused economic and reputation damage to plaintiffs and that a decision to vacate the Report would redress plaintiffs' injuries by reducing the public stigma attached to plaintiffs' products, rejuvenating product sales, and discouraging future public and private smoking restrictions based upon the Report.

Thereafter, both parties filed cross-motions for summary judgment. Plaintiffs argued that the evidence established that EPA had violated sections 403(c) and 404 of the Radon Act and that the Report was arbitrary and capricious. EPA countered that its Report and research procedures complied with the Radon Act and that the Report was the product of reasoned decisionmaking.

On July 17, 1998, the district court granted partial summary judgment to the plaintiffs on Counts I, II, and III. See *Flue-Cured Tobacco Coop. Stabilization Corp. v. United States EPA*, 4 F. Supp. 2d 435 (M.D.N.C. 1998). While rejecting plaintiffs' argument that the Report constituted unauthorized regulation under section 404, the court held that EPA violated section 403(c) by excluding a tobacco-industry representative from the second advisory committee. See *Flue-Cured Tobacco*, 4 F. Supp. 2d at 441-49. Addressing the proper remedy, the court considered whether inclusion of a tobacco-industry representative on the advisory group would likely have produced a different result. See *Flue-Cured Tobacco*, 4 F. Supp. 2d at 447-49. The court concluded that "[h]ad EPA reconciled industry objections voiced from a representative body during the research process, the ETS Risk Assessment [Report] would very possibly not have been conducted in the same manner nor reached the same conclusions." *Flue-Cured Tobacco*, 4 F. Supp. 2d at 466. The court accordingly

issued an order vacating "Chapters 1 thru 6 of and the Appendices" to the Report. *Flue-Cured Tobacco*, 4 F. Supp. 2d at 466.

The parties filed cross-appeals challenging the district court's decision.

III.

Because questions of subject matter jurisdiction concern a court's power to reach the substantive issues of a case, *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 442 n.4 (4th Cir. 1999), we first address EPA's contention that the district court lacked subject matter jurisdiction. EPA maintains that subject matter jurisdiction was lacking because the Report did not constitute reviewable final agency action under the APA, or in the alternative, because plaintiffs lacked standing to challenge the Report. Because we conclude that the Report was not final agency action, and therefore, that the district court lacked subject matter jurisdiction to hear plaintiffs' claims, *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994), we do not reach the standing issue.[6] *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (Brandeis, J., concurring) ("It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

5 U.S.C. § 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Other than agency action made specifically reviewable by statute, § 704 limits the APA's non-statutory right of judicial review to final agency action. 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). As the Radon Act does not create a specific private right of action, plaintiffs rest their claims for relief on the APA's general review provisions, 5 U.S.C. §§ 702, 704. See *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990). To determine whether the Report is subject to judicial review under the APA, the court must

---

[6]Standing is a Constitutional question. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

decide whether the Report qualifies as final agency action under the APA.

In *Federal Trade Comm'n v. Standard Oil Co.*, 449 U.S. 232, 239-40 (1980), the Supreme Court articulated several factors for determining when agency action is "final" for the purposes of judicial review under the APA: (1) is the agency action a definitive statement of the agency's position; (2) does the action have direct and immediate legal force requiring parties' immediate compliance with the agency's pronouncement; (3) do the challenges to the agency's actions involve legal issues fit for judicial resolution; and (4) would immediate judicial review speed enforcement and promote judicial efficiency? The Court refined its *Standard Oil Co.* finality analysis in *Bennett v. Spear*, 520 U.S. 154 (1997), by narrowing the inquiry to two issues:

> First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett*, 520 U.S. at 177-78 (internal citations omitted); see also *COMSAT Corp. v. National Sci. Found.*, 190 F.3d 269, 274 (4th Cir. 1999) ("[A]n agency action may be considered 'final' only when the action signals the consummation of an agency's decisionmaking process *and* gives rise to legal rights or consequences.") (italics in original). The parties do not dispute that the Report marks the consummation of the agency's decisionmaking process. Thus, the critical issue is whether the Report gives rise to legal consequences, rights, or obligations.

As acknowledged by the district court, the Report creates no "legal rights or obligations" and has no direct regulatory effect on plaintiffs. *Flue-Cured Tobacco*, 857 F. Supp. at 1142 n.5 & 1144. Section 404 of the Radon Act explicitly prohibits the Report from having any regulatory effect. § 404, 100 Stat. 1760. Despite expressing concern about the Report's inability to create legal rights or obligations, the district court concluded that the judiciary's increased sensitivity "to review administrative actions even when they do not create direct obligations or have enforcement effect" supported extending judicial

review to agency actions carrying only indirect consequences. *Flue-Cured Tobacco*, 857 F. Supp. at 1142-43. It described as "problematic" the statutory prohibition on creation of "any legal rights or obligations," 857 F. Supp. at 1144.

In evaluating the Report's practical and persuasive consequences, the district court pointed to regulations issued by the General Service Administration (GSA) which relied, in part, on the Report to justify its ban of the use of tobacco products in GSA motor vehicles. *Flue-Cured Tobacco*, 857 F. Supp. at 1142 (citing 58 Fed. Reg. 63,531 (1993)). The district court noted that "given the emotionally charged nature of the debate over smoking and the general public's tendency to panic at the slightest association of any product with cancer . . . identifying ETS as a carcinogen unquestionably will have far-reaching consequences." *Flue-Cured Tobacco*, 857 F. Supp. at 1143. The district court concluded that the Report carried indirect regulatory effects sufficient to convert the Report into reviewable final agency action under the APA. *Flue-Cured Tobacco*, 857 F. Supp. at 1142.

In evaluating whether the Report is reviewable agency action, we first look for direction to the Radon Act. As noted above, section 404 of the Radon Act prohibits the EPA (and the courts) from giving the Report "any regulatory" effect. § 404, 100 Stat. at 1760. Congress stated that the Radon Act "shall not be construed to authorize the [EPA] to carry out *any* regulatory program or *any* activity other than research, development, and related reporting, information dissemination, and coordination activities." (italics added) § 404, 100 Stat. at 1760. Congress has spoken on the EPA's ability under the statute to create legal rights, obligations, or consequences. As a court charged with interpreting Congress's intent, we are not at liberty to ignore Congress's directive that the Report is not regulatory and Congress's labeling of the Report as a research publication.

In this respect, there is no sufficient reason to give the word "any" a meaning other than its ordinary English usage. That meaning is: "to any extent: in any degree: at all." *Webster's Third New Int'l Dictionary*, 97 (1971). This meaning has been adopted by the courts. In *United States v. Monsanto*, 491 U.S. 600, 607 (1989), a drug forfeiture statute, 21 U.S.C. § 853(a), required that upon conviction a person "shall forfeit . . . any property" that was derived from the

commission of the offense. The Court construed the word "any": "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." 491 U.S. at 607. In *Suggs v. Pan Am. Life Ins. Co.*, 847 F. Supp. 1324, 1345 (S.D. Miss. 1994), "any" was construed: "It should be pointed out that the words 'nothing,' 'any,' 'alter,' 'exempt,' and 'relieve' used in . . . [Titles 29 and 15] are all comprehensive terms. They do not require extraneous support for their breadth. More comprehensive terms cannot be found in the English language than the words 'nothing,' 'any,' and 'every.'" Of like effect is *First Nationwide Bank v. United States*, 48 Fed. Cl. 248, 261 (2000): "There are perhaps few words in the English language as unambiguous as the word 'any.' It is not 'susceptible of two different and reasonable interpretations'."

Having concluded that the Report carries no legally binding authority, we must decide whether agency action producing only coercive pressures on third parties is reviewable under the APA. We believe that the Supreme Court has spoken on this issue: Agency action which carries no "direct and appreciable legal consequences" is not reviewable under the APA. See *Bennett*, 520 U.S. at 178 (discussing *Dalton v. Specter*, 511 U.S. 462 (1994); and *Franklin v. Massachusetts*, 505 U.S. 788 (1992)).

In *Franklin v. Massachusetts*, 505 U.S. 788, 790 (1992), Massachusetts challenged the method for counting overseas federal employees for the 1990 census after losing a seat in the United States House of Representatives. The automatic reapportionment statute required the Secretary of Commerce to submit a "tabulation of total population by States" to the President after conducting the census. *Franklin*, 505 U.S. at 792 (quoting 13 U.S.C. § 141(b)). The President then submitted to Congress a statement of the number of representatives apportioned to each State. *Franklin*, 505 U.S. at 792 (citing 2 U.S.C. § 2a(a), (b)). As part of its challenge, Massachusetts sought review of the Secretary of Commerce's report. The Secretary's report, similar to the EPA report in the case at hand, carried "no direct consequences for the reapportionment" but served "more like a tentative recommendation than a final and binding determination." *Franklin*, 505 U.S. at 798. Because the Secretary's report independently could not alter the States' entitlement to representatives' seats and the President was not

bound by the Report, the Supreme Court determined that the Secretary's report was not reviewable final agency action. *Franklin*, 505 U.S. at 796-98.

In *Dalton v. Specter*, 511 U.S. 462, 466 (1994), plaintiffs challenged the closure of a naval shipyard seeking to obtain judicial review of base closure recommendations made by the Secretary of Defense and Defense Base Closure and Realignment Commission. The plaintiffs in *Dalton*, like the plaintiffs in this case, alleged that the Secretary and Commission failed to follow procedural mandates of the Defense Base Closure and Realignment Act of 1990, Pub. L. 101-510, 104 Stat. 1808, in issuing their recommendations. 511 U.S. at 469. The Supreme Court concluded that the reports carried "'no direct consequences' for base closings" because the President was free to "approve or disapprove the Commission's report" and held that the recommendations were not reviewable final agency action. *Dalton*, 511 U.S. at 469-70 (quoting *Franklin*, 505 U.S. at 798).

Both *Franklin* and *Dalton* involved agency recommendations which carried persuasive value with the President who was the final decisionmaker. However, the persuasive value and practical barriers associated with the agencies' recommendations were insufficient to create reviewable agency action under the APA because the challenged agency actions, although they might have influenced the President's decision, did not create any legal rights, obligations, or consequences. Instead, it was the actions of the President which had a direct legal effect on the parties.[7] *Dalton*, 511 U.S. at 469; *Franklin*, 505 U.S. at 797.

Plaintiffs argue that a pragmatic approach recognizing the Report's powerful influence on other agencies and third parties is appropriate. However, in *Dalton*, the statute required the President to either accept or reject the Commissioner's recommendation in its entirety. *Dalton*, 511 U.S. at 470. The Supreme Court characterized this distinction as immaterial. *Dalton*, 511 U.S. at 470. Regardless of how the challenged reports by the Commission and Secretary affected the President's range of choices, the final decision which produced the actions

---

[7]The President's actions were not reviewable because the President is not an agency. *Franklin*, 505 U.S. at 800-01.

directly affecting the parties remained the President's. *Dalton*, 511 U.S. at 470. Thus, even when agency action significantly impacts the choices available to the final decisionmaker, this distinction does not transform the challenged action into reviewable agency action under the APA.

Like the harms at issue in *Dalton* and *Franklin*, the consequences complained of by plaintiffs stem from independent actions taken by third parties. Even if other agencies have relied on the Report in imposing tobacco related restrictions, these regulations are not direct consequences of the Report, but are the product of independent agency decisionmaking. Like the President in *Franklin* and *Dalton*, GSA and other federal agencies are free to embrace or disregard the Report which is advisory and does not trigger the mandatory creation of legal rules, rights, or responsibilities. Cf. *Natural Resources Defense Council v. United States EPA*, 16 F.3d 1395, 1407 (4th Cir. 1993).[8]

Likewise, while the Report's persuasive value may lead private groups to impose tobacco-related restrictions, these decisions are attributable to independent responses and choices of third parties. See *Industrial Safety Equipment Ass'n v. Environmental Protection Agency*, 837 F.2d 1115, 1121 (D.C. Cir. 1988) (concluding that indirect effect from "reactions and choices of industry customers and workers" insufficient to establish final agency action). The actions and consequences complained of by plaintiffs do not legally flow from the Report nor are they the result of legal rights or consequences created by the Report. See *Bennett*, 520 U.S. at 178.

Furthermore, as a practical matter and of considerable importance, if we were to adopt the position that agency actions producing only pressures on third parties were reviewable under the APA, then almost any agency policy or publication issued by the government

---

[8]Plaintiffs have chosen not to challenge GSA's reliance on the EPA Report in enacting regulations which ban the use of tobacco products in all GSA motor vehicles. See 41 C.F.R. § 101.39.300(d) (2001); 58 Fed. Reg. 63531, 63532 (1993). While the government cannot create jurisdiction, it advises in its brief that such a course might have been unobjectionable. (Br. p.17)

would be subject to judicial review. We do not think that Congress intended to create private rights of actions to challenge the inevitable objectionable impressions created whenever controversial research by a federal agency is published. Such policy statements are properly challenged through the political process and not the courts.

Plaintiffs argue that *Bennett v. Spear*, 520 U.S. 154 (1997), supports their argument that the Report's coercive power transforms the Report into reviewable final agency actions. To the contrary, we are of opinion that *Bennett* supports the government's position. In *Bennett*, plaintiffs challenged a biological opinion issued by the Fish and Wildlife Services to the Bureau of Reclamation regarding the use of reservoir water to protect the habitat of endangered species. *Bennett*, 520 U.S. at 157-59. The Supreme Court found that the biological opinion constituted reviewable final agency action under the APA because it "alter[ed] the legal regime to which the action agency [was] subject, authorizing it to take the endangered species if (but only if) it complie[d] with the prescribed conditions." *Bennett*, 520 U.S. at 170, 178. "Unlike the reports in *Franklin* and *Dalton* which were purely advisory and in no way affected the legal rights of the relevant actors, the Biological Opinion at issue . . . [had] direct and appreciable legal consequences." 520 U.S. at 178. It and an Incidental Take Statement "alter[ed] the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." *Bennett*, 520 U.S. at 178. The Supreme Court had stressed that failing to follow the biological opinion would have exposed the Bureau to "substantial civil and criminal penalties, including imprisonment." *Bennett*, 520 U.S. at 170.

The Report, unlike the biological opinion in *Bennett*, does not act as a permit or carry any comparable legal consequences. While plaintiffs may fear that the Report will increase their vulnerability to liability, no statutory scheme triggers potential civil or criminal penalties for failing to adhere to the Report's recommendations.

In summary, for the principal reasons that the statute forbids that the EPA carry out any regulatory program or any activity other than research, development and related reporting, information dissemination, and coordination activities specified in the Title; that there are

no legal and direct consequences of the report which constitute final agency action; and that holding the report is subject to review under the APA would expose to immediate court review the various results of controversial governmental research as soon as published but before they are given regulatory effect, we are of opinion and hold that there has not been final agency action under 5 U.S.C. §§ 702 and 704. The decision of the district court is remanded for dismissal on account of want of subject matter jurisdiction. As noted, the cross-appeal of the plaintiffs is denied. We do not decide the other questions raised in this case.

## IV.

Every State in this circuit produces tobacco. The economy of Virginia has been dependent upon the tobacco industry, to a great extent, for almost 400 years and in the other States of the circuit almost that long and as much, or more. In context, that is about the same period of time that the Plantagenets and Tudors ruled England. North Carolina is the nation's largest producer, and North Carolina, Virginia and South Carolina together produce more than half the nation's tobacco crop. So the importance of the decision of the EPA at issue here may not be over-emphasized. Nevertheless, exclusion by the EPA of any meaningful tobacco industry representative from the advisory committee mentioned in the Radon Statute is unexplained. But these facts do not affect our lack of jurisdiction under the APA to review the report at issue in this case. The legal questions in the case are substantial. The practical consequences of the EPA Report are great and affect the livelihood of thousands.

On that account, we stay the issuance of the mandate upon our decision for a period of 30 days after it has become final in order that the plaintiffs may file a petition for certiorari in the Supreme Court of the United States and seek a stay from that Court in connection with such filing. See *Reamer v. Beall*, 506 F.2d 1345, 1346 (4th Cir. 1974); *Rich v. Naviera Vacuba, S.A.*, 295 F.2d 24, 26 (4th Cir. 1961).

## V.

The judgment of the district court is accordingly vacated and the case remanded for dismissal for want of subject matter jurisdiction.

*VACATED AND REMANDED WITH INSTRUCTIONS*